**In re SAR–MANCO, INC., Debtor.**

**Bankruptcy No. 86–00611–BKC–6P1.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

May 27, 1986.

Thomas B. Mimms, Jr., Tampa, Fla., Steven H. Judd, Sarasota, Fla., and Michael G. Williamson, Orlando, Fla., for John E. Fowler.

Mark Horwitz, Orlando, Fla., and Malka Isaak, Tampa, Fla., for debtor.

## ORDER GRANTING MOTION OF JOHN E. FOWLER FOR RELIEF FROM STAY

GEORGE L. PROCTOR, Bankruptcy Judge.

The matter before the Court is the motion of JOHN E. FOWLER ("FOWLER") for relief from the automatic stay of 11 U.S.C. § 362(a). The Court, having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses, having considered the arguments of counsel, including memoranda of law, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

The Debtor, SAR–MANCO, INC., commenced a case under Chapter 11 of the Bankruptcy Code shortly before the scheduled sale of its sole asset pursuant to a Final Judgment of Foreclosure in favor of FOWLER. Shortly thereafter, FOWLER instituted this contested matter to obtain relief from the automatic stay. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

The Debtor's sole asset consists of certain real property commercially known as the Port-O-Call Recreational Vehicle Resort in Kissimmee, Osceola County, Florida near Walt Disney World/EPCOT and other tourist attractions. FOWLER is the previous owner of the property and owed $525,-000.00 secured by a purchase money first mortgage to his seller and $3.5 million to Park Bank of Florida secured by a second mortgage on the property.

FOWLER sold the property to the Debtor in June, 1985 for a total sales price of $4,900,000.00 consisting of a $4,000,000.00 wraparound purchase money first mortgage (which wrapped around the existing first mortgage of $525,000.00) due December 10, 1985, a $155,000.00 purchase money second mortgage, an unsecured promissory note by the Debtor to pay the broker's commission of $245,000.00, and $500,000.00 in cash. In addition to the notes and mortgages which FOWLER took back from the Debtor, the Debtor also granted to FOWLER as additional collateral for the purchase money notes an Assignment of Rents, Leases, Profits and Contracts and a security interest in virtually all personal property in any way connected with the real property.

When FOWLER sold the property to the Debtor, Park Bank released its second mortgage in exchange for a payment by FOWLER of $1,000,000.00 and took as col-

lateral for the balance of $2,500,000.00 a collateral assignment of the $4,000,000.00 purchase money note and wraparound purchase money first mortgage, the Assignment of Rents, and a pledge of the security agreement covering the personal property. The re-financed loan with Park Bank was due January 10, 1986, one month after the due date of the $4,000,000.00 note. Park Bank did not take a collateral assignment of the $155,000.00 purchase money second mortgage.

The parties intended the $4,000,000.00 purchase money loan to be interim financing only until the Debtor could arrange for long term financing. The Debtor's comptroller testified concerning the efforts to obtain replacement financing. For various reasons all such efforts failed, and the Debtor defaulted in paying FOWLER the interest payment due November 10, 1985 and the principal balance due December 10, 1985. FOWLER filed suit to foreclose both the $4,000,000.00 mortgage and the $155,-000.00 mortgage on December 27, 1985.

After the foreclosure action was filed, FOWLER entered into an agreement on January 24, 1986 with the Debtor, Albert E. Strickland, Rick R. Robineau, and Randerson, Inc. under which the Debtor was to sell the real property to Randerson, Inc. by March 21, 1986 and pay the indebtedness owing to FOWLER. The purchase price was $4,155,000.00 plus an amount equal to interest on $4,155,000.00 at the rate of 12% per annum from January 8, 1986 to the date of closing. FOWLER agreed to accept that total sum in full satisfaction of the indebtedness owed him. The agreement also provided for certain other benefits to the parties.

FOWLER and the Debtor entered into a stipulation for entry of Final Judgment of Foreclosure in the event that the proposed sale to Randerson, Inc. failed to close. Indeed, Randerson, Inc. did fail to close, and Final Judgment of Foreclosure was entered on March 24, 1986 on both the $4,000,-000.00 mortgage and the $155,000.00 mortgage plus interest, title search expenses, taxes, attorney's fees, and court costs, for a total of $4,501,289.00 as of March 21, 1986, plus interest thereafter at the rate of 12% per annum. The final judgment scheduled the foreclosure sale for April 17, 1986.

FOWLER filed a Motion for Appointment of Receiver to take possession of Port-O-Call pending foreclosure sale. Hearing on the Motion for Appointment of Receiver was scheduled for April 3, 1986.

At approximately the same time, Albert E. Strickland, the president and stockholder of the Debtor corporation, sold his stock to one Gene Mason. The Debtor then filed for relief under Chapter 11 of the Bankruptcy Code on April 1, 1986. Because of the automatic stay, the April 3 State Court hearing on the Motion for Appointment of Receiver and the April 17 foreclosure sale did not occur.

Upon the liquidation of Park Bank in mid-February, the Federal Deposit Insurance Corporation ("FDIC") became the owner and holder of FOWLER's note to Park Bank for $2.5 million, together with the collateral for that note. There was evidence that Mr. Gene Mason was negotiating with FDIC to purchase the FOWLER note and collateral package.

The Debtor has raised a threshold question of whether FOWLER has standing to seek relief from the automatic stay in light of FOWLER's collateral assignment of the $4,000,000.00 note and mortgage to Park Bank as security for a loan to him of $2.5 million and FOWLER's default in failing to pay the loan when it matured on January 10, 1986.

The Court is satisfied that FOWLER has sufficient rights in the Debtor's property to proceed with the motion for relief from stay. First, the Final Judgment of Foreclosure is in favor of FOWLER alone as the Plaintiff. Even aside from the $4,000,-000.00 note and mortgage, the final judgment includes the Debtor's $155,000.00 purchase money note and mortgage to FOWLER, which the evidence shows was never collaterally assigned to anyone.

Finally, the Court is confident that the FDIC is fully capable of protecting whatev-

er rights, if any, it may have in the final judgment. The FDIC is aware of the pending motion because one of the witnesses produced by the Debtor at the evidentiary hearing was the officer of the FDIC responsible for handling the FOWLER account.

FOWLER asserts two grounds for lifting the automatic stay. First, he contends that he is not receiving adequate protection of his interest in the property. Secondly, he argues that the Debtor filed the pending Chapter 11 case in bad faith.

The relevant statutes are 11 U.S.C. § 362(d) and (g) which state:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

\*   \*   \*   \*   \*   \*

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

The Court feels that the good faith filing issue is dispositive of the matter. The issue of good faith as cause for lifting the automatic stay is discussed in detail in *In re Victory Construction Co., Inc.*, 9 B.R. 549, (Bankr.C.D.Cal.1981). The Court stated as follows:

The "good faith" issue may be analyzed as follows:

(1) Does a debtor's lack of "good faith" in filing a Chapter 11 case constitute "cause" to vacate the automatic stay under § 362(d)(1)?

(2) Does the law impose a "good faith" condition on debtor's right to file or maintain a proceeding under Chapter 11?

If the answer to these questions is negative, plaintiff's right to relief in this case is limited to a consideration of the issues of adequate protection, the existence of equity, and whether the property is necessary to an effective reorganization.

(3) Was the debtor's petition in this case filed in "good faith"?

"Good faith" as a standard of confirmation in debtor rehabilitation or reorganization proceedings, or as a condition to the debtor's right to file and maintain proceedings aimed at rehabilitation or reorganization, has appeared in many provisions of the Bankruptcy Act of 1898; and the courts have explored the meaning of the term in a wide variety of fact situations and circumstances.... (Page 551)

\*   \*   \*   \*   \*   \*

(xi) **Title 11**

While "good faith" is made a condition to the confirmation of a plan under Chapter 11 and Chapter 13, Title 11 does not contain a provision expressly conditioning the right to file or maintain a proceeding on the "good faith" of the debtor at the time the proceeding is initiated.

The "good faith" confirmation standard is expressed as follows:

The plan has been proposed in good faith and not by any means forbidden by law. [Section 1129(a)(3) and 1325(a)(3) ].

Review of these statutory provisions discloses that: (i) Sections 74, 77, 77B, Chapter IX, and Chapter X each contained an express "good faith" filing requirement; Section 75, Chapters XI, XII, XIII of the Act, and Chapters 11 and 13

of the Code do not; and (ii) prior to Chapters XI, XII, and XIII, and the Code, Section 75 was the only reorganization or rehabilitation section which did not contain a "good faith" filing requirement.

As the term "good faith" continued to appear in these rehabilitation and reorganization statutes, the case law was developing and imparting dimension and scope to the term. The issue was often raised early in the proceeding by secured creditors who asserted (i) that the filing was an attempt to delay foreclosure despite the lack of any rational basis to believe that a composition or extension was possible, and (ii) that the proceeding was a sham, or device to deprive the secured creditor of rightful recourse to its collateral. These objections were voiced as a "lack of good faith" in initiating the proceeding. Early cases under Section 12 noted that the provisions for composition or extension were clearly at variance with the common law, and must be strictly construed. When the economic realities of the debtor were so bleak that no fair compromise or extension was possible, the courts easily determined that the debtor's purpose was delay and harassment of creditors, and was an abuse of the legislative intent. This was expressed as a "lack of good faith." (Page 555)

\* \* \* \* \* \*

### Lack of good faith as grounds to dismiss a Chapter 11 case

\* \* \* \* \* \*

Conduct interdicted in the cases can be summarized as conduct which is inconsistent with the underlying purposes and contemplation of the reorganization and rehabilitation process and constitutes a perversion of legislative intent. The cases analyzing these concepts and principles are as consistent with the purposes and objectives of Chapter 11 of the Code as with the prior legislative enactments from which the Code was derived. It would be more than anomalous to conclude that in consolidating the provisions

of Chapters X, XI, and XII in Chapter 11 of the Code, Congress intended to do away with a safeguard against abuse and misuse of process which had been established and accepted as part of bankruptcy philosophy (either by statute or decisional law) for almost a century. "Good faith" must therefore be viewed as an implicit prerequisite to the filing or continuation of a proceeding under Chapter 11 of the Code.

### Lack of good faith as "cause" for relief from stay

\* \* \* \* \* \*

The most traditional challenge to the "good faith" of the debtor was mounted by secured creditors who sought to avoid the threat of serious and irreversible harm to their economic interests while the debtor plodded forward in search of a means of financial rehabilitation. The right to "adequate protection" as a condition to further restraint against lien enforcement and continued use or exploitation of the collateral is a statutory recognition of the seriousness of that threat and the legitimacy of the plea for relief. The echo of this plea, sounding through the cases under Sections 74, 75, 77B, and Chapters X, XI, and XII, is heard repeatedly in the courts now administering the new Chapter 11.

The Code has isolated and identified this type of litigation over the debtor's "good faith" in the provisions of Section 362(d)(1), which address the lack of "adequate protection" to a party seeking relief.

\* \* \* \* \* \*

The long and varied history of these types of disputes may be regarded as the backdrop for the "cause" provision in § 362(d)(1) of the Code in situations where "adequate protection" is not really the issue. The Code was drafted to permit the impact of the filing, i.e., the stay, to be relieved for any "cause"; that is, for any reason cognizable to the equity power and conscience of the court as

constituting an abuse of the reorganization or rehabilitation process.

The relief afforded by § 362(d) is essential to the structural symmetry of the Code: the equitable balance between the rights of debtors, creditors, and other interests affected by the ebb and flow associated with the reorganization and rehabilitative process. Preservation of this symmetry demands the availability of that relief whenever necessary to protect the integrity of that process.

Accordingly, and for the foregoing reasons, the debtor's lack of "good faith" in filing a case under Chapter 11 is "cause", independent of the existence or lack of adequate protection, to vacate the automatic stay under § 362(d)(1). (Pages 558–560)

On the other hand, some courts, including this one, were reluctant to follow where Congress had not led. Congress in enacting the Bankruptcy Code of 1978 imposed "good faith" only as a requirement of confirmation of a plan of reorganization under § 1129(a)(3). No such requirement of good faith is present either in § 109, which deals with eligibility to be a debtor, nor in any other provision of Chapter 11. If Congress agreed with the case law under earlier bankruptcy statutes requiring good faith for filing and maintaining a reorganization case, surely the new Bankruptcy Code would have included such a provision. Consequently, it was felt improper to dismiss a Chapter 11 case or grant relief from the automatic stay for "bad faith". However, this position can no longer be maintained in light of recent decisions by the United States Court of Appeals for the Eleventh Circuit.

In *In re Albany Partners, Ltd.,* 749 F.2d 670, (11th Cir.1984), the court stated at page 674:

Although "good faith" is required for confirmation of a reorganization plan, 11 U.S.C. § 1129(a)(3), Chapter 11 does not expressly condition the right to file or maintain a proceeding on the "good faith" of the debtor at the time the proceeding is initiated. However, § 1112(b) of the Code permits a bankruptcy court to convert or dismiss a case for "cause". The provision lists nine examples of cause, but the list is not exhaustive. The pertinent legislative history states, "The court will be able to consider other factors as they arise, and use its equitable powers to reach an appropriate result in individual cases." H.R.Rep. No. 595, 95 Cong., 1st Sess. 406 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787 6362. Accordingly, the determination of cause under § 1112(b) is "subject to judicial discretion under the circumstances of each case." *In the Matter of Nancant,* 8 B.R. 1005, 1006 (Bankr.D. Mass.1981). The equitable nature of this determination supports the construction that a debtor's lack of "good faith" may constitute cause for dismissal of a petition. In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate. See *In re Eden Associates,* 13 B.R. 578, 583–85 (Bankr.S.D.N.Y.1981); *In re Victory Construction Co., Inc.,* 9 B.R. 549, 555–56, 558, 564–65 (Bankr.C.D.Cal. 1981); *In re G-2 Realty Trust,* 6 B.R. 549, 552–54 (Bankr.D.Mass.1980); *In re Dutch Flat Investment Co.,* 6 B.R. 470, 471–72 (Bankr.N.D.Cal.1980); See also *In the Matter of Levinsky,* 23 B.R. 210, 219–20 (Bankr.E.D.N.Y.1982); *In the Matter of Northwest Recreational Activities, Inc.,* 4 B.R. 36, 38–40 (Bankr.N. D.Ga.1980).

The facts in *In re Albany Partners, Ltd.* are strikingly similar to those in the pending case. The moving party held a mortgage on a motel. On the eve of foreclosure sale, the debtor filed for Chapter 11, claiming to be the owner and operator of the motel. The court found it unlikely that the debtor could complete an effective Chapter

11 reorganization and concluded that the secured parties were entitled to relief from the automatic stay. The court also concluded that the debtor did not file the Chapter 11 petition in good faith and that the case therefore should be dismissed.

Another recent Eleventh Circuit case decided April 1, 1986 is *In re Waldron*, 785 F.2d 936, (11th Cir.1986). The court reversed the Bankruptcy Court's decision which had permitted a financially secure individual and his wife to file a joint Chapter 13 petition in bankruptcy for the sole purpose of rejecting an option agreement which they felt might not be as profitable as it could be. The court stated at pages 939 and 941:

The Bankruptcy Code expressly provides that a bankruptcy court may not confirm a Chapter 13 plan unless "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3) (1982). Indeed, "the 'good faith' requirement of § 1325(a) is the only safety valve available through which plans attempting to twist the law to malevolent ends may be cast out. The good faith test should be used accordingly." *In re Leal*, 7 B.R. 245, 248 (Bankr. D.Colo.1980). In this case, the bankruptcy court should have used the good faith test to cast out the Waldrons' malevolent scheme.

While it is difficult to discern the congressional intent behind section 1325(a)(3) because of a dearth of legislative history, the term "good faith" is certainly not new to bankruptcy law. Section 141 of the Bankruptcy Act of 1898, 11 U.S.C.A. § 541 (West 1979) (repealed 1979), required that a Chapter X petition for corporate reorganization be filed in good faith or face dismissal. Section 146 of the Act, 11 U.S.C.A. § 546 (West 1979) (repealed 1979), set forth four specific criteria of the term "good faith" but emphasized that the meaning of the term was not to be limited by these four tests. Cases interpreting sections 141 and 146 have therefore defined good faith broadly:

Basically, the general elements of good faith, undefined in the statute, mean that *the petition must be filed with the honest intent and genuine desire to utilize the provisions of Chapter X for its intended purpose—to effectuate a corporate reorganization—and not merely as a device to serve some sinister and unworthy purpose* of the petitioner.... The court cannot and will not tolerate such misuse of the reorganization process.

*In re Southern Land Title Corp.*, 301 F.Supp. 379, 428 (E.D.La.1968) (emphasis added). See also *Mongiello Brothers Coal Corp. v. Houghtaling Properties Inc.*, 309 F.2d 925, 930 (5th Cir.1962) ("[i]n considering the presence or absence of good faith, it must be borne in mind that the Act is not to be abused by the extension of its privileges to those not within the contemplation of it...."). These discussions are equally applicable to the good faith provision in Chapter 13. See *In re Leal*, 7 B.R. 245, 247 (Bankr.D. Colo.1980).

\*    \*    \*    \*    \*    \*

We hold that with section 1325(a)(3) Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose. Accordingly, whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives. If the court discovers unmistakable manifestations of bad faith, as we do here, confirmation must be denied.

Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.

The cornerstone of the bankruptcy courts has always been the doing of equity. The protections and forgiveness inherent in the bankruptcy laws surely re-

quire conduct consistent with the concepts of basic honesty. Good faith or basic honesty is the very antithesis of attempting to circumvent a legal obligation through a technicality of the law. The Waldrons, it seems clear to us, sought to abuse the process through a technicality to serve their own malevolent and selfish aims. This abuse should not have been permitted. We therefore reverse the decision of the district court and remand with instructions to dismiss the Waldrons' petition.

■ The direction to this Court is clear, and we must consider the good faith of the Debtor in filing for Chapter 11 and maintaining the pending case. The issue is whether the Debtor's invocation of the protection afforded by Chapter 11 is for reasons consistent with the congressional intent of rehabilitating and reorganizing businesses or whether it filed for the purpose of delaying and frustrating FOWLER from proceeding with foreclosure sale and realizing on his collateral. The burden of proof is on the Debtor on all issues except the issue of the Debtor's equity in the property.

The critical question is whether the Debtor has a realistic chance to reorganize. Rather than carrying the burden of proof on this issue, the evidence presented by the Debtor conclusively establishes that it has no hope of successfully reorganizing.

The Debtor's sole asset consists of the Port-O-Call Recreational Vehicle Resort. The Debtor rents spaces in the park either on a daily basis or on a monthly basis. In addition, the Debtor sells memberships in the resort. A membership in an RV resort was described as being similar to a membership in a country club. It gives the member no ownership in the real estate or the resort, but only the right to use the facilities. A member may spend up to 15 days out of 21 at the resort at a cost of $1.00 per night. A member also apparently enjoys reciprocal rights to stay at a large number of participating RV parks across the United States. The cost of the membership is a one-time payment of $6,000.00 with an annual maintenance fee of $198.00. The one-time payment can be all cash, in which case there is a 10% discount making the actual cost $5,400.00. The purchase price can also be financed by paying 10% down and the balance of $5,400.00 over a number of years with interest.

There was evidence that the sale of memberships is not regulated by any governmental agency, and that this lack of regulation is of concern to the State of Florida, Department of Business Regulation, Division of Florida Land Sales, Condominiums, and Mobile Homes. Indeed, there was testimony that there is proposed legislation pending before the Legislature to regulate the sale of memberships.

The Debtor offered expert testimony from a certified public accountant as to income projections for Port-O-Call. The accountant offered two income projections. The difference between the two income projections concerns the volume of the sale of memberships. However, with that exception, both projections are essentially the same. Despite a current occupancy rate of only about 32%, the Debtor's evidence assumed it would be possible to increase rental rates by 25%, which would produce annual rental income of $815,200.00.

This is puzzling even if we assume that the Debtor's business judgment is correct that it can raise rental rates at a time of substantial vacancy in the park. The evidence showed that excluding income from sales of memberships under Sar-Manco, for the first four months of 1986 Port-O-Call had revenue of $380,000.00 in contrast to revenue of $410,968.00 during the first four months of 1985 under FOWLER's ownership. The Debtor's comptroller explained that the reduction in revenue of $31,000.00 was caused by there being fewer rental spaces available for daily rentals because of the number of spaces that the park had to set aside to accomodate people who had purchased memberships. One would assume then that the rental income will progressively decrease as the Debtor sells more and more memberships.

The accountant's first projection of income assumed membership sales of one per week, and income from membership sales of $300,000.00 per year. This figure is also puzzling. If each purchaser paid the down payment of $600.00 and financed the balance of $5,400.00, then the total down payments for the year would be $31,200.00 plus a stream of income from the monthly payments. On the other hand, if each purchaser paid cash of $5,400.00, then the total income would be $280,800.00 for the year.

In any event, if the projected income of $300,000.00 for membership sales is subtracted from the total projected annual income of $1,501,200.00, the annual income amount is reduced to $1,201,200.00. When the projected total annual expenses of $667,200.00 are subtracted from total revenue of $1,201,200.00, the amount left for debt service is $534,000.00. The projected interest only on the FOWLER final judgment.is $576,000.00 per year. Thus, without the projected income of $300,000.00 from membership sales, the Debtor cannot even cover interest on the judgment. Secondly, even with the projected annual income from membership sales, the accountant's testimony was that it would take ten years for the Debtor to pay off the judgment.

The alternate projection assumed 500 membership sales per year which would produce estimated annual income of $750,-000.00. Total annual revenue was projected at $2,008,558.00 less operating expenses of $722,500.00, leaving net cash for debt service of $1,286,058.00. The accountant testified that it would take four years to pay off the FOWLER final judgment under this income projection. Without the revenue from membership sales of $750,000.00, the amount available for debt service drops to $536,058.00. Once again, without the membership sales, there is not sufficient cash flow even to cover interest on FOWLER's final judgment.

Even if one accepts the income projections prepared by the Debtor's accountant, two points are crystal-clear. First, the Debtor is not in a position to make immediate payment of the FOWLER final judgment, but it will take years to pay it. Secondly, without the income from future membership sales, the Debtor will never be able to pay the judgment.

We are alarmed that the Debtor is continuing to sell memberships in the RV park to the public at a price of $6,000.00 each at a time when the park is in the midst of foreclosure proceedings and the pending Chapter 11 case and the Debtor has no assurance whatsoever of being able to continue to deliver to members in the future the right to use the facilities of the park. By separate order, we have granted FOWLER's motion for preliminary injunction to stop the continued sale of memberships and have further required the debtor to deposit into an interest-bearing escrow account the monthly payments from members who are financing with the Debtor their purchase of memberships. Thus, the availability of revenue from the sale of memberships is very much in doubt.

The conclusion is inescapable that the Debtor's intention in filing Chapter 11 on April 1 was to obtain the automatic stay and thereby stop the State Court hearing scheduled for April 3 to consider appointment of a receiver for the R.V. park, and stop the scheduled foreclosure sale on April 17, while continuing to collect the income from the park and from the sale of memberships as long as possible without making any payments whatsoever to the secured creditor, JOHN E. FOWLER, or to other creditors. The Debtor has failed in its efforts to obtain new financing and, alternatively, to sell the park. Unless the Debtor's new stockholder can immediately make a substantial infusion of new capital so that the Debtor can·pay FOWLER, economic reality conclusively establishes that the Debtor has no realistic chance of successfully reorganizing. This is bad faith within the meaning of *In re Albany Partners, Ltd., supra,* and *In re Waldron, supra.*

Our conclusions are supported by a long line of decisions by other bankruptcy courts. One of the earliest and most often

cited cases in this area is *In re G–2 Realty Trust,* 6 B.R. 549, (Bankr.D.Mass.1980). G–2 Realty was established as a Massachusetts nominee trust. The debtor obtained a bank loan secured by a mortgage on the debtor's improved real estate. The debtor defaulted. The bank foreclosed and a foreclosure sale was scheduled for April 23, 1980. The debtor's declaration of trust was amended on March 24, 1980 to convert the debtor into a business trust which is an entity eligible to be a chapter 11 debtor. Thereafter, on April 17, 1980, three of the unsecured creditors filed an involuntary Chapter 11 against the debtor. The Bank filed a motion to dismiss the case, asserting that the involuntary petition was the result of collusion between the debtor and the petitioning creditors, and that therefore, the filing was made in bad faith. Furthermore, the bank contended that the debtor was not an entity eligible for relief under Chapter 11.

The Court found that the debtor effected the change from a nominee trust to a business trust solely to become eligible as a debtor under Chapter 11, and thereby to delay or prevent the eminent foreclosure sale of substantially all of its property. The effect of the filing was to deprive the bank of its right to foreclose, which otherwise would have been available to it. The court concluded that the mere attempt to avoid a foreclosure sale in those circumstances is not the intent behind Chapter 11 and does not demonstrate the required good faith. Consequently, the court granted the motion to dismiss.

In *In re Lotus Investments, Inc.,* 16 B.R. 592, (Bankr.S.D.Fla.1981), the Debtor commenced a case under Chapter 11 several days prior to the scheduled sale of its sole asset, consisting of real estate, pursuant to a foreclosure judgment. The judgment determined that the indebtedness due the secured creditor under the mortgage was approximately $220,000.00 while appraisal testimony valued the property at $350,000.00. There was no evidence to establish the necessity of the property for an effective reorganization of the Debtor, and there was no evidence of the number or extent of obligations owed by the Debtor to any other entities. Nor was there any evidence that the Debtor had provided or offered or could provide periodic payments, an additional or substitute lien, or some indubitable equivalent to adequately protect the secured party's interest. The court concluded that lack of good faith in filing a petition under Chapter 11 entitled a secured creditor to relief from the automatic stay. Consequently, the court lifted the stay to permit the secured party to complete its foreclosure.

In *In re Mildevco, Inc.,* 40 B.R. 191, (Bankr.S.D.Fla.1984), the Court held that the filing of Chapter 11 petitions by three corporations lacked good faith and would be dismissed where prior to filing the petitions, the corporations had been dormant, they lacked even the trappings of legitimate business existence, the dispute which precipitated the filing of the petitions was basically of a two-party nature, the amount of unsecured debt was nominal, the corporations professed an intention to embark on a new marketing scheme, and there was lack of reasonable prospects of successful reorganization. The court summarized the relevant case law as follows at page 193:

> The outlines of the good faith concept are emerging from the caselaw. Where a debtor's reorganization effort involves essentially a two-party dispute which can be resolved outside the bankruptcy court's jurisdiction, and the purpose of the filing is to frustrate a creditor's sale, it has been held that the petition was not in good faith. See *In re Landmark Capital Company,* 27 B.R. 273 (Bkrptcy. D.Ariz.1983). It is an imposition on a bankruptcy court's jurisdiction to file a case in order to permit the principals of the debtor to retrieve, at their creditors' risk, a portion of their investment by appreciation in land values or some new but untested marketing theory. Cf. *In re The Alison Corp.,* 9 B.R. 827 (Bkrptcy S.D.Cal.1981).

Finally, in *In the Matter of Herndon Executive Center, Inc.,* 36 B.R. 803,

(Bankr.M.D.Fla.1984), the mortgage holder obtained its Final Judgment of Foreclosure on August 23, 1983. The foreclosure sale was scheduled for October 24, 1983, the very day the debtor filed for Chapter 11. Because of the automatic stay, the foreclosure sale was cancelled. The subject real property consisted of an office building in Orlando, Florida, which was partially rented but did not generate sufficient cash flow to service the secured indebtedness. The mortgagee moved to dismiss the case on the basis that the petition was filed in bad faith and that there was unreasonable delay which was prejudicial to creditors and that the debtor had no realistic expectation to effectuate a reorganization. In other words, there was no possibility of reorganization because there was no longer a mortgage which was in default which could be reinstated. Rather, there could only be satisfaction by payment in full of the amount of the final judgment and the accrued interest and costs, and the debtor was financially incapable of doing that. The court held as follows at page 807 in dismissing the case:

Considering the totality of the undisputed facts of this case, there is hardly any doubt that this Debtor invoked the jurisdiction of this Court for the single purpose to forestall an imminent loss of its sole asset, albeit, a newly acquired one and to frustrate secured creditors in their efforts to enforce their legitimate rights against the subject property. This was not a part of the congressional design when Chapter 11 was enacted and clearly, this Debtor's action does not represent a good faith attempt to effect a reorganization as contemplated by the Code. In light of the foregoing, it is unnecessary to consider the alternative ground for dismissal based on § 1112(b)(2) urged by Freedom Federal, that is, Herndon Executive's inability to effectuate a reorganization.

The Debtor in the pending case faces the same problem as the Debtor in *Herndon Executive Center*. The mortgage has been reduced to final judgment. The Debtor has no ability to pay the final judgment. Under one income projection made by the Debtor's accountant, it would take ten years to pay off the judgment and under the alternative income projection, it would still take four years. That is not the indubitable equivalent of proceeding to foreclosure sale immediately. This Chapter 11 case, like *Albany Partners* and the many cases consistent with it, is nothing more than a two-party dispute between the Debtor and FOWLER, which can and should be resolved in state court. The sole purpose of the Chapter 11 filing was to frustrate and delay the foreclosure action for as long as possible while the Debtor continued to receive the various revenues from operation of the RV park.

For the reasons set forth above, the Court concludes that the Debtor's pending Chapter 11 case was filed in bad faith. This constitutes "cause" within the meaning of § 362(d)(1) for lifting the automatic stay. Therefore, FOWLER's motion for relief from stay should be granted.

The Court notes that having found that the case was filed in bad faith, it might seem appropriate to dismiss the case. However, the matter before the Court is FOWLER's motion for relief from stay. FOWLER has filed a separate motion to dismiss the case for bad faith filing. Under Bankruptcy Rule 2002, the clerk must give to the Debtor and all creditors not less than 20 days' notice by mail of a hearing on a motion to dismiss the case. The clerk mailed the Notice of Hearing on April 11, 1986 scheduling the hearing for July 8, 1986 at 2:00 p.m. on the motion of JOHN E. FOWLER for dismissal of case. Consequently, it would be premature and procedurally improper for the Court to rule on the motion to dismiss at this time.

Accordingly, it is

ORDERED and ADJUDGED that the motion of JOHN E. FOWLER for relief from stay be and the same is hereby GRANTED, and the automatic stay of 11 U.S.C. Section 362(a) be and the same is hereby lifted as to JOHN E. FOWLER to enable him to complete in all respects, in-

cluding foreclosure sale, his pending foreclosure action against the Debtor, SAR–MANCO, INC., provided, however, that he shall not seek or obtain an *in personam* deficiency judgment against the Debtor for any unsecured claims unless and until the Debtor's pending Chapter 11 case is dismissed.