In re BELL PARTNERS, LTD., a Florida limited partnership, Debtor.

Bankruptcy No. 87–966–BK–J–11.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 5, 1988.

James P. Wolf, Jacksonville, Fla., for Century 21.

Edwin W. Held, Jr., Jacksonville, Fla., Martin F. Brecker, New York City, for debtor.

Lynne L. England, Tampa, Fla., Asst. U.S. Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon motion for relief from automatic stay and adequate protection filed by creditors Century 21 Executive Center Trust No. II and Century 21 Executive Center Trust No. III (hereinafter referred to as "Century 21"). Hearings on this motion were held on January 11, 1988, and January 13, 1988, and upon the evidence presented, the Court enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. This contested motion involves a request by the secured creditor for relief from the automatic stay to continue its

mortgage foreclosure action in the Duval County, Florida, Circuit Court to enforce its lien on certain real property owned by the debtor.

2. The debtor is a Florida limited partnership which, on March 4, 1987, filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The debtor has continued in possession of its property and manages and operates its business as a debtor in possession. 11 U.S.C. § 1108.

3. Other than cash, the debtor's sole assets consist of four (4) parcels of improved real property located in Jacksonville, Florida (the "Real Property"), and the furniture located within the improvements thereon. Situated upon the Real Property are three office buildings and a restaurant. The first parcel of Real Property is located at 101 Century 21 Drive and the improvement is referred to as Building 1. The second parcel of Real Property is located at 103 Century 21 Drive and the improvement is referred to as Building 2. The third parcel of real property is located at 8120 Atlantic Boulevard, immediately to the north of Building 1, and the improvement is referred to as the Restaurant. The fourth parcel of Real Property is located at 1 Bell Tell Way and its building is referred to as the Bell Building.

4. Building 1 is a two-story, multi-tenant office building consisting of approximately 27,869 rentable square feet located on a site containing approximately 125,880 square feet. Building 2 is a two-story, multi-tenant office building consisting of approximately 28,185 rentable square feet situated on a site containing approximately 111,078 square feet. The Restaurant is a one-story building occupied by a single tenant and consists of approximately 5,625 square feet on a site containing approximately 48,451 square feet. The Bell Building is a 3-story office building occupied by a single tenant consisting of approximately 56,273 rentable square feet situated on a site containing approximately 179,162 square feet.

5. Prior to December, 1983, the Real Property was owned by Century 21 which had owned and operated the Real Property and the Buildings thereon for a period of approximately eight (8) years. In December, 1983, Century 21 sold the Real Property to the debtor for a combined purchase price of $5,700,000.

6. Each parcel of Real Property is encumbered by a separate first mortgage. All four parcels of Real Property are encumbered by a wrap around mortgage held by Century 21 (the "Wrap Mortgage") which secures a promissory note in the principal amount of $4,700,000 (Century 21 Exhibit 1). Finally, all four parcels of Real Property are encumbered by a second wrap around mortgage (the "Second Wrap Mortgage") which secures a note in the principal amount of $5,000,000. (Century 21 Exhibit 2).

7. Pursuant to the terms of the Wrap Mortgage and the note it secures, the debtor was to make interest only payments to Century 21 in the amount of $35,250 per month. From that sum, Century 21 was to make the monthly payments to the first mortgagees of principal and interest totaling $33,635.40. The wrap note provided that, upon default by the debtor and failure to cure said default, Century 21 could accelerate the balance due under the note and said sum would bear interest from that date until paid at the highest rate allowable under state law. The wrap note was a non-recourse obligation such that, in the event of a default by the debtor, Century 21 could look only to the property for repayment of the debt and could not seek a deficiency judgment against the debtor. (Century 21 Exhibits 1 and 3).

8. The debtor defaulted under the terms of the wrap note and mortgage by failing to make the payment due in December, 1986, in the amount of $35,250, and the payments of a like amount due each month thereafter. Notwithstanding the default by the debtor, Century 21 continued to make the monthly payments of principal and interest to the first mortgagees for December, 1986, and January and February, 1987.

9. After giving the debtor notice of its default and after the debtor failed to cure that default, Century 21 accelerated the

balance due under the wrap note and mortgage.

10. On February 26, 1987, Century 21 filed its complaint in the Duval County Circuit Court to foreclose the Wrap Mortgage (Century 21 Exhibit 4). On that same date, Century 21 also filed an Emergency Motion for Appointment of Receiver (Century 21 Exhibit 5) and a Motion for Temporary Injunction (Century 21 Exhibit 7) requiring the debtor to deposit the rents realized from the property into the registry of the Court pending a hearing on the appointment of a receiver, which hearing was set for March 12, 1987. On February 26, 1987, the Duval County Circuit Court entered its Temporary Injunction which required that, until further order of the Court, the debtor was to deposit into the Court registry all funds in the debtor's possession or coming into its possession from the rents and other income from the property. (Century 21 Exhibit 8). Century 21 posted the bond required by that order. (Century 21 Exhibit 9).

11. Six days later, on March 4, 1987, the debtor commenced this case. The primary purpose for filing the Chapter 11 petition was to stop the mortgage foreclosure action from proceeding further. (Century 21 Exhibit 10 at Page 61).

12. As of December 31, 1987, Century 21 is owed the total of $5,846,279.41 which is secured by the Wrap Mortgage encumbering the Real Property. Of that amount, approximately $3,021,002.35 constitutes monies due and owing the mortgagees holding first mortgage liens on the Real Property. As a result, the net debt (over and above the first mortgage debt) owed by the debtor to Century 21 and secured by the Real Property is $2,825,277.06. Interest continues to accrue on the debt at the default rate of $3,219.18 per day. (Century 21 Exhibit 11).

13. In addition, according to the testimony of the debtor at its Rule 2004 examination (Century 21 Exhibit 10 at pages 106–08), the holder of the Second Wrap Note and Mortgage is owed a minimum of $700,000. This debt is also secured by a lien against the Real Property.

14. The debtor conducts no business other than the operation of the three office buildings and the restaurant (the "buildings") situated upon the Real Property. The debtor has no income available to it other than the rental income received through the operation of the buildings. (Century 21 Exhibit 10, pages 10–11).

15. The debtor has contracted the management of the buildings to Grayside Realty Corporation. The general partners of the debtor conduct the remaining business of the debtor which consists of informing the investor limited partners of the operating results of the Buildings and preparing other documents such as tax returns. (Century 21 Exhibit 10, pages 11–13).

16. Of the four Buildings, the Bell Building and the Restaurant are subject to long-term single tenant leases and, accordingly, have been and continue to be occupied at 100 percent. The average economic occupancy in Buildings 1 and 2 has decreased from 98.33 percent in 1983 and 97.99 percent in 1984 to 56.32 percent in 1986. As of August 31, 1987, the physical occupancy of Buildings 1 and 2 was 35.19 percent and 74.7 percent, respective–16, or an average of 54.95 percent. (Century 21 Exhibit 15).

17. The debtor has experienced a negative cash flow, after payment of the debt service to Century 21 under the wrap mortgage (putting aside the payment of any debt service under the second wrap mortgage), for each year that the debtor has owned the Real Property. That annual loss after debt service has risen from an annual loss of $98,498 in 1984 (when all four (4) Buildings were virtually completely leased) to an annual loss of $260,947 in 1986. During the period of December, 1983, through the end of 1986, the debtor sustained a total loss, after the payment of debt service to Century 21, of $480,999. Had the debtor made its December, 1986, payment to Century 21, of $35,250, that total loss would have exceeded $500,000.00. (Century 21 Exhibit 12).

18. The increase in annual loss after debt service is also reflected in the drop in

net operating income before debt service experienced by the debtor for the same period. In 1984, the debtor's average net monthly operating income was $27,041.00. By 1986, that average net monthly operating income had decreased to $10,566.00, a drop of over 250 percent. (Century 21 Exhibit 12). Indeed, as indicated by Mr. Arthur Calace on behalf of the debtor, the income from the Real Property has never provided sufficient funds to meet the monthly debt service which the debtor voluntarily agreed to pay to Century 21 as part of the purchase of the Real Property from Century 21.

19. While the debtor proposes to retain a new management company to assist its current management company in the operation of the Real Property, that new management company proposes to do the same type of marketing and management that has resulted in the above losses and decline in occupancy. (Century 21 Exhibit 10 at pages 109–10).

20. The debtor has submitted its proposed plan of reorganization. Under the plan, the debtor proposes to divide the Century 21 Wrap Note and Mortgage into four separate second mortgages. (Century 21 Exhibit 10, page 103, line 25 through page 104, line 10). The debtor proposes to pay to Century 21 deferred cash payments secured by those separate second mortgages in amounts totaling $2,840,000. However, the present value of those payments to Century 21 will be only $1,140,000, resulting from effective average interest rates under the restated second mortgages ranging from 1.03 percent to 3.85 percent. (Debtor's Disclosure Statement at pages 8–12). By contrast, the debtor had agreed by contract to pay Century 21 interest at the rate of 9 percent on the sums secured by the wrap mortgage.

21. Even under the diminished payments to Century 21, the debtor will experience a net loss (after paying the restated debt service) during the first ten years of plan operation in the amount of $327,033.00. (Century 21 Exhibit 14, page 7). The debtor proposes to fund this net loss by creating a new general partner who will contribute $75,000.00 and by selling twenty-five (25) new limited partnership units at the price of $12,000.00 per unit. (Disclosure Statement at pages 13–14).

22. The debtor's plan of reorganization assumes among other things that each of the following will occur:

(a) The value of the Real Property is found by the Court to be $2,840,000.00. (Century 21 Exhibit 10, Page 101, Line 18 through Page 103, Line 24).

(b) The debtor can divide the Wrap Mortgage into four (4) separate restated second mortgages. (Century 21 Exhibit 10, Page 103, Line 25 through Page 104, Line 10).

(c) As to the Bell Building, the debtor will be able to recover from that tenant 50% of the increases in real estate taxes (Century 21 Exhibit 10, Page 94, Lines 9–16);

(d) As to the Bell Building, the expenses will increase at 3% per year (Century 21 Exhibit 10, Page 94, Lines 17–19);

(e) As to the Restaurant, the expenses will increase at 2% per year (Century 21 Exhibit 10, Page 94, Line 24 through Page 95, Line 7);

(f) As to Buildings 1 and 2, the rental rate will increase at 5% per year (Century 21 Exhibit 10, Page 95, Lines 18–24);

(g) As to Buildings 1 and 2, pass-through revenues for currently occupied space will increase at 2% per year (Century 21 Exhibit 10, Page 95, Line 25 through Page 96, Line 5);

(h) As to Buildings 1 and 2, the debtor will be able to lease vacant space at $9.00 per square foot with leases averaging 5% increases each year (Century 21 Exhibit 10, Page 96, Lines 6–19);

(i) As to Buildings 1 and 2, the debtor will receive pass-through revenues on the vacant space at $2.00 per square foot once the space is leased (Century 21 Exhibit 10, Page 96, Line 24 through Page 97, Line 4);

(j) As to Buildings 1 and 2, the debtor will succeed in decreasing vacancies at the rate of 10% per year (Century 21 Exhibit 10, Page 96, Lines 8–19);

(k) As to Buildings 1 and 2, the debtor will be required to give no more than a three month concession in rent and pass-through income to attract new leases (Century 21 Exhibit 10, Page 100, Lines 1–4);

(*l*) As to Buildings 1 and 2, expenses will increase at 3% per year (Century 21 Exhibit 10, Page 100, Lines 5–7);

(m) As to Buildings 1 and 2, capital improvements will only require a reserve of $5,000 per year (Century 21 Exhibit 10, Page 100, Lines 8–9);

(n) As to Buildings 1 and 2, the debtor will only have to offer tenant improvements of $8.00 per square foot to attract new tenants (Century 21 Exhibit 10, Page 100, Lines 15–17);

(*o*) As to Buildings 1 and 2, the debtor will only be required to pay a 6% commission on three year leases (Century 21 Exhibit 10, Page 100, Lines 18–20);

(p) The holder of the Second Wrap Mortgage will waive its claim for an amount in excess of $700,000 (Century 21 Exhibit 10, Page 104, Line 22 through Page 108, Line 7);

(q) The holders of $425,345.21 in unsecured claims will waive and release their claims (Century 21 Exhibit 10, Attachment 11, Page 5);

(r) The current limited partners will agree to extinguish their interests and purchase a new limited partnership interest at $12,000 per unit (Century 21 Exhibit, Page 108, Lines 16–21); and

(s) The existing general partners will agree to cancel their interests and a new general partner will be formed and will contribute a sum of $75,000 (Century 21 Exhibit 10, Page 108, Line 22 through Page 109, Line 1).

The debtor has acknowledged that, assuming each of the above assumptions does not take place, the viability of the plan will be affected. (Century 21 Exhibit 10, page 109, lines 7–11).

23. Having evaluated the testimony of appraisers, Frank Osborn for Century 21, and Phillip Johnson for debtor, the Court accepts the valuation of the Real Property proposed by Mr. Osborn and finds that the fair market value of the Real Property is in the total amount of $5,872,000. That valuation is arrived at as follows:

| | |
|---|---|
| Bell Building | $2,482,000 |
| Building 1 | 1,430,000 |
| Building 2 | 1,445,000 |
| Restaurant | 515,000 |
| Total | $5,872,000 |

The Court notes that this valuation is similar to the assessed value of the property for tax purposes of $5,861,200, and is also consistent with the purchase price paid by the debtor for the Real Property of $5,700,-000.

24. The Court rejects the testimony of the debtor's appraiser, Phillip Johnson. As to the Bell Building, in utilizing the income approach (upon which Johnson relies), he does not properly calculate the reversion value of the Building at the end of the Southern Bell lease 13 years in the future. Rather, the appraiser makes the assumption that he owner of that property, at the conclusion of a below-market lease of $4.42 per square foot will continue to lease the property at a rate of $4.42 per square foot. As to Buildings 1 and 2, the value calculations reached by Johnson result in an unreasonably low value per square foot for the Buildings in the range of $10.00 to $13.00. Johnson's total valuation of the property in the amount of $2,100,000 is inconsistent with the assessed value for the Real Property and purchase price paid by the debtor.

## CONCLUSIONS OF LAW

█ 1. Century 21 is entitled to relief from the automatic stay if it can demonstrate either:

(a) cause, including the lack of adequate protection of its interest in the Real Property (§ 362(d)(1)); or

(b) that the debtor has no equity in the Real Property and the property is not needed to effectively reorganize the debtor (§ 362(d)(2)).

Century 21 argues that the debtor has filed its petition for reorganization in bad faith and that the bad faith filing constitutes cause for lifting the stay under § 362(d)(1). Following the lead of the 11th Circuit Court of Appeals, this Court has previously recognized that a bad faith filing is cause for relief from the automatic stay under § 362(d)(1). *See In re Sar–Manco, Inc.,* 70 B.R. 132 (Bankr.M.D.Fla.1986). As in *Sar–Manco,*

> the issue is whether the debtor's invocation of the protection afforded by Chapter 11 is for reasons consistent with the congressional intent of rehabilitating and reorganizing businesses or whether it filed for the purpose of delaying and frustrating [Century 21] from proceeding with [its foreclosure action]. The burden of proof is on the debtor on all issues except the issue of the debtor's equity in the property.

70 B.R. at 139.

2. In *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987), the 11th Circuit Court of Appeals set forth factors which this Court may consider in determining whether a petition for reorganization has been filed in bad faith. Those factors are as follows:

(a) The lack of a realistic possibility of an effective reorganization;

(b) Evidence that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights;

(c) Whether the debtor is seeking to use the bankruptcy provisions to create and organize a new business, not to reorganize or rehabilitate an existing enterprise or to preserve going concern values of a viable or existing business;

(d) The timing of the debtor's relevant actions;

(e) Whether the debtor appears to be merely a "shell corporation"; and

(f) Whether the debtor was created, or the subject property transferred to the debtor, for the sole purpose of obtaining protection under the automatic stay of Chapter 11 by filing bankruptcy.

825 F.2d at 298 (citations omitted).

3. Reviewing each of the above factors in reverse order, the Court concludes that all but one of the factors are present here.

4. First, it appears that the debtor is nothing more than a shell entity. The debtor is a limited partnership, the only assets of which are the Real Property, the buildings situated thereon, and the furniture situated therein. The only income to the debtor is that which is realized from the operation of the Real Property. The only business of the debtor is the management of that property which the debtor has contracted out to a management company. There are no employees of the debtor as such; rather, the entire business of the debtor is operated by the management company and by the general partners of the debtor. Even then, the general partners do nothing more than receive input from the property management company, report to the limited partners as to the status of their investment, and prepare tax returns.

5. The debtor sought the protection of this Court only after Century 21 had filed its mortgage foreclosure action in state court and had obtained an injunction requiring the debtor to deposit into the state court registry the only income of the debtor, that being the rents realized from the operation of the Real Property. The debtor had defaulted in December, 1986, by failing to make its monthly payments due and owing under the Wrap Note and Mortgage. As a result of the default, Century 21 accelerated the balance due on the note which resulted in an increase in the interest rate. On February 26, 1987, Century 21 filed its foreclosure action and obtained a temporary injunction. A receiver hearing was set for March 12, 1987. On March 4, 1987, the debtor filed its Chapter 11 petition.

6. The plan proposed by the debtor will result essentially in the creation of a new entity. As a limited partnership, the debtor is made up only of general and limited partners. The debtor proposes that its existing general partners extinguish their interests and that a new general partner succeed to the place of the former general partner. The debtor also proposes that the existing limited partners agree to extinguish their interests, and the previous (or new) limited partners agree to purchase *new* limited partnership units. The result of the above would leave the shell limited partnership in place, but with new general and limited partners.

7. As can be seen from the testimony of the debtor in its Rule 2004 examination, the primary purpose for filing this Chapter 11 proceeding was to frustrate the legitimate efforts by Century 21 to exercise its right to foreclose its mortgage in state court. There is no question that the debtor was in default under the terms of the wrap note and mortgage. There is no question but that Century 21 has the absolute right to foreclose its mortgage and, pursuant to the terms of the wrap mortgage itself, to obtain a receiver to manage the property. Having lost control of its rents through the entry of the temporary injunction, and being faced with the very real possibility of having a receiver appointed, the debtor filed its Chapter 11 petition.

8. The only remaining issue is whether there exists a realistic possibility that the debtor will be able to reorganize. The Court concludes for the reasons set forth below that the debtor has failed to meet its burden by demonstrating to the satisfaction of this Court that it has a realistic possibility of reorganizing.

9. The only income available to the debtor is the rental income to be realized by the debtor through the operation of the Real Property. Both the Bell Building and the Restaurant are subject to single tenant long-term leases. Accordingly, the only properties which could bring in additional income for the debtor are Buildings 1 and 2.

10. The historical performance of Buildings 1 and 2 under the control of the debtor is disappointing. Economic occupancy for these two buildings declined from 98.33 percent in 1983 to 56.32 percent in 1986. As of August 31, 1987, the average physical occupancy in these two buildings was 54.95 percent.

11. Furthermore, the debtor has never operated the Real Property at a profit during the entire four years it has remained in possession of the property. For the period from December, 1983, through the end of December, 1986, the debtor sustained a total net loss of almost $500,000 after the payment of debt service. Net operating income before debt service decreased from the amount of $27,041 per month in 1984 to $10,566 per month in 1986. While the debtor proposes to bring on a new management company, that management company will operate the property in the same fashion as has the previous management company which has contributed to these losses.

12. It is readily apparent to this Court that the only way the debtor can possibly reorganize is to restructure its secured debt. Under the plan proposed by the debtor, the debtor will divide Century 21's wrap mortgage into four separate second mortgages in the total principal amount of $2,119,000 (which the debtor has computed as constituting the net claim of Century 21 after deduction of the monies owing to the first mortgagees); the evidence, however, demonstrates that the total net claim of Century 21 is in excess of $2.8 million. The debtor proposes to make deferred cash payments to Century 21 secured by these second mortgages in the total amount of $2,840,000. However, those payments will have a present value to Century 21 of only $1,140,000.

13. Century 21 is certainly impaired under the debtor's plan. Accordingly, pursuant to § 1129, unless Century 21 accepts the plan, the debtor must proceed under the provisions of § 1129(b). Having brought this motion for relief from stay, it appears that Century 21 will not accept the plan, and the debtor will probably be involved in § 1129(b) litigation.

14. In order to cram down the plan as to Century 21, the debtor must demonstrate, among other things, that Century 21 will receive on account of its claim deferred cash payments "of a value, as of the effective date of the plan, of at least the value of [Century 21's] interest in the estate's interest in [the Real Property]." Section 1129(b)(2)(A)(i)(II). If the present value of the payments to Century 21 under the plan does not equal the secured interest of Century 21 in the Real Property, the debtor cannot succeed in its "cram down" efforts.

15. The unrebutted testimony presented to the Court is that Century 21's total claim (consisting of principal and interest, but without the calculation of attorney's fees) is $5,846,279.41. Of that, $3,021,002.35 constitutes monies due and owing to the first mortgagees. Thus, Century 21's net claim is $2,825,277.06. Under the plan, Century 21 would receive total payments of $2,840,000, but with a present value of $1,140,000. Therefore, unless the debtor can demonstrate that Century 21 has a secured interest of only $1,140,000 or less, the plan will not succeed over Century 21's objection.

16. In order for the plan to succeed, the Court must find that the value of the real property is $4,161,002.35 or less. That figure is arrived at by taking the total amount of the monies due to the first mortgagees and adding the present value of the payments proposed to be made by the debtor to Century 21 under the plan. As set forth above, the Court has determined that the Real Property has a value well in excess of $4.2 million. Accordingly, the plan proposed by the debtor will not succeed over the objection of Century 21.

17. Even if the Court were to find (which it does not) that the value of the property equals or is less than $4.1 million, an effective reorganization under the plan is still unlikely for the following reasons:

(a) The plan assumes that the debtor will be able to increase the rental rate at Buildings 1 and 2 at an amount of 5% per year. This presumption is contradicted by the debtor's own expert, who testified that an increase of no more than 3% per year is a more likely increase in rental rate.

(b) The plan assumes that the debtor will be able to decrease its vacancies in Buildings 1 and 2 at the rate of 10% per year. As demonstrated above, this is totally contrary to the debtor's past performance in the property. While new management is proposed, that new management will manage the property in the same fashion as did the debtor which resulted in the losses set forth above.

(c) Even assuming that the debtor were successful in increasing the rents and decreasing the vacancies as proposed, the debtor nonetheless would experience a shortfall of $150,000 over the first five years of operation. The debtor proposes to fund this shortfall with an influx of capital from new limited and general partners. The debtor has presented no competent evidence to this Court that the debtor will succeed in rasing this additional capital.

(d) The plan assumes that a secured creditor (the holder of the second wrap mortgage) will waive a claim for in excess of $700,000. Again, the debtor has failed to present any competent testimony that this will occur.

(e) The plan also assumes that the holders of unsecured claims totaling $425,000 will likewise waive their claims. Once again, the debtor has failed to present any competent testimony that this will occur.

18. As can be readily seen from a review of the foreclosure pleadings and the pleadings in this Chapter 11 case, this case is nothing more than a two-party dispute between the debtor and Century 21 which can and should be resolved in the pending state court foreclosure proceeding. The holders of the first mortgages on the Real Property will be protected in the foreclosure proceeding. The holders of the second wrap mortgage (which is secured) and the insider unsecured creditors, according to the debtor, are prepared to waive their

claims. The only remaining creditors of the estate are unsecured creditors holding claims for approximately $25,000.00. The existence of these claims does not alter the fact that this essentially is a two-party dispute best left to the state courts.

20. The Court concludes that the debtor has failed to meet its burden of proving that it has a realistic chance of reorganizing. It is apparent that the petition was not filed for reasons consistent with the congressional intent of rehabilitating and reorganizing business; rather, having found that it made a bad business deal with Century 21, the debtor has sought the protection of this Court to structure a deal more favorable to the debtor. The Court concludes that the Chapter 11 petition in this case was filed by the debtor in bad faith, and that this constitutes cause for lifting the stay pursuant to § 362(d)(1).

21. Section 362(d)(2) requires the Court to grant relief from the stay if (a) the debtor does not have an equity in the property and (b) such property is not necessary to an effective reorganization.

22. With respect to the first prong of this test, the Court has found that the value of the Real Property is $5,872,000. That property is encumbered by the wrap mortgage in the total amount as of December 31, 1987, of $5,846,279.41. The property is also encumbered by a second wrap mortgage in the minimum amount of $700,-000. Accordingly, the debtor has no equity in the property.

23. Even if the Court were not to consider the second wrap mortgage, as of December 31, 1987, the debtor's equity in the Real Property over and above the first wrap mortgage, as of December 31, 1987, was only $25,720.59. With interest accruing at the rate of $3,219.18 per day, that equity had vanished by the time of the hearing on this motion. Accordingly, even without considering the amount secured by the second wrap mortgage, the debtor lacks an equity in the property.

24. In determining the second prong of the test under § 362(d)(2), as the real property is the only asset of the debtor of any consequence, it would appear that the debtor does need the property in order to reorganize. However, the Court's inquiry need not stop there. The Court is required to inquire further to determine whether there is a reasonable possibility of a successful reorganization within a reasonable time. *In re St. Peter's School,* 16 B.R. 404, 408 (Bankr.S.D.N.Y.1982). The debtor has the burden of demonstrating the existence of a realistic possibility of reorganization.

25. As set forth above, the debtor has failed to meet its burden of demonstrating that it has a realistic possibility of successfully reorganizing within a reasonable period of time. Thus, grounds exist for granting Century 21 relief from the automatic stay pursuant to § 362(d)(2).

26. Finally, Century 21 argues that it is entitled to relief from the automatic stay because its interest in the real property lacks adequate protection. Adequate protection typically is found by finding the existence of an equity cushion. In the instant case, there is no equity cushion in favor of Century 21. Further, the debtor has made total payments to Century 21 of $64,000 against interest (at the contract rate) which has accrued in the total gross amount (before deduction of first mortgage debt) of $458,250 (for the period December, 1986, through January, 1987); at the default rate, interest has accrued in the total gross amount of $1,255,480.20 for the same period. While the debtor has offered to pay to Century 21 (pursuant to a Stipulation with Respect to the Use of Cash Collateral) the "net operating income" realized upon operation of the property for the period December, 1987, through the date of confirmation of a plan, past history indicates that this net operating income will not exceed $10,000 while interest accruing under Century 21's wrap note accrues at the default rate of $3,219.81 per day. Accordingly, even that offer of adequate protection is not sufficient in this case.

27. The Court by separate order will grant relief from the automatic stay imposed by 11 U.S.C. § 362.