In re **FOREST RIDGE, II, LIMITED PARTNERSHIP, a North Carolina limited partnership, Debtor.**

**Bankruptcy No. C–B–90–30062.**

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

May 16, 1990.

938

James L. Paul, Gary A. Barnes, Gambrell, Clarke, Anderson & Stolz, Atlanta, Ga. and Travis W. Moon, Karen S. Williams, Rayburn, Moon, Smith, P.A., Charlotte, N.C., for debtor.

Roy H. Michaux, Jr., Richard W. Wilson, Perry Patrick Farmer & Michaux, P.A., Charlotte, N.C. and Albert F. Durham, Craig Whitley, Durham & Whitley, Charlotte, N.C., for Boston Co.

ORDER DENYING MOTIONS OF BOSTON COMPANY FOR DISMISSAL, FOR ORDER PROHIBITING USE OF CASH COLLATERAL, FOR RELIEF FROM STAY, AND FOR SEQUESTRATION OF RENTS AND OTHER PAYMENTS, AND GRANTING DEBTOR'S MOTION TO USE CASH COLLATERAL

MARVIN R. WOOTEN, Bankruptcy Judge.

This matter came on before the court for hearing on April 23–26, 1990, upon a continued hearing on the Motions of Boston Safe Deposit and Trust Company, as Trustee of Residential Fund–I ("Boston") to Dismiss, for Relief from Stay or for Adequate Protection, for an Order Prohibiting Use of Case Collateral and for Sequestration of Rents and Other Payments and Request for Application of 362(e); and on the Motion of Forest Ridge II, Limited Partnership ("Debtor") for Order for Permission to Use Cash Collateral. Debtor's Motion for Permission to Use Cash Collateral was filed on the date of the filing of the Petition in this case, January 17, 1990, and a preliminary hearing was conducted on January 26, 1990. At that time, the court entered a preliminary Order granting Debtor the right to use cash collateral on an emergency basis and scheduled a final hearing on Debtor's Motion for February 16, 1990. The Boston Motions were filed on February 2, 1990, and initially scheduled for hearing on February 28, 1990. Due to the discovery being conducted by both parties in connection with their respective Motions, all Motions were continued to be heard in a consolidated fashion. Since the filing of the bankruptcy case, the parties have engaged in extensive discovery relating to all aspects of these Motions, and to the Debtor's pre and post bankruptcy activities as well as the activities of Boston. After careful consideration of the evidence and arguments of counsel, and in consideration of the briefs filed by the parties, the court does find and conclude as follows:

FINDINGS OF FACT

1. Debtor, Forest Ridge II, Limited Partnership, is a North Carolina Limited Partnership whose only assets are a 330 unit residential apartment complex generally known as The Villages of Forest Ridge located on Reddman Road, Charlotte, North Carolina (the "Property") and the income and accounts generated from the operation of the Property.

2. Boston Safe Deposit and Trust Company is a Massachusetts Trust Company and serves as the trustee of Residential Fund–I ("Boston").

3. On or about February 21, 1989, Boston, as lender, and Debtor, as borrower, closed a loan in which Boston agreed to provide permanent financing for the Property of up to $16,500,000.00 (the "Loan").

4. The Loan, and the collateral therefor, are evidenced by the following documents and instruments, of which Boston is owner and holder:

a. A Loan Agreement (the "Loan Agreement") which stated the terms and provisions regarding the disbursement of the Loan;

b. A Promissory Note (the "Note") in the original principal amount of $16,500,000.00;

c. A Deed of Trust and Security Agreement (the "Deed of Trust") recorded on February 24, 1989, in Book 5973 at Page 41 in the Mecklenburg County Public Registry and Financial Statements recorded in the Office of the Secretary of State of North Carolina and the Mecklenburg County Public Registry.

d. An Assignment of Rentals and Leases (the "Assignment of Rentals") recorded on February 24, 1989, in Book 5973 at Page 30 in the Mecklenburg County Public Registry.

5. On or about February 21, 1989, Boston disbursed $15,105,000.00 of the proceeds of the loan to Debtor.

6. Of the remaining $1,395,000.00 of loan proceeds, $395,000.00 was to be disbursed to Debtor to reimburse it for operating deficits incurred (the "Deficit Holdback") and $1,000,000.00 could be earned by and disbursed to Debtor if certain requirements were met (the "Income Achievement Holdback"). The Income Achievement Holdback was to be made and calculated according to the provisions of the Loan Agreement. But, pursuant to the Debtor's request, an exhibit was attached to the earlier proposed loan agreement which gave examples of how to calculate the Income Achievement Holdback. Cole, Jr. testified that he used this exhibit in calculating the Deficit Funding and Holdback requested on June 30, and that this exhibit was furnished as an accommodation to him by Jill Hatton, so that he could confirm his understanding of what was to be the final agreement between the parties.

7. The general partner of the Debtor is Forest Ridge Company, Limited Partnership ("Forest Ridge Company"), also a North Carolina Limited Partnership whose only asset is its interest in Debtor.

8. The general partners of Forest Ridge Company are Alfred Cole, Sr. and James Treadwell.

9. It appears from the evidence that none of the general or limited partners of Debtor or of Forest Ridge Company contributed any cash to the capital of Debtor or Forest Ridge Company, including the initial $1,000.00 capital contribution set out in the partnership agreement. They did, however, execute personal guarantees on certain loans.

10. Since this Debtor's operations began, the Property has been and still is managed by Corum Development Company ("Corum") a non-debtor entity whose principals are Alfred Cole, Sr. and James Treadwell.

11. Immediately following the closing of the Loan, Boston advanced $15,105,000.00 of the Loan proceeds from which all then existing liens against the Property, including the liens of all development and construction loan deeds of trust, were paid in full; all guarantees for debts secured by such liens were cancelled and all collateral for such debt was released, and Boston's Loan became the only indebtedness secured by a lien on the Property. As a result of this loan, Boston received a fifty-five (55%) percent equity interest in the Property.

12. Boston Company asserted at trial that Boston's obligation to fund the remainder of the Loan was covered by the Loan Agreement which provided for a "Deficit Holdback" of $395,000.00 to cover initial operating losses and an "earnout" provision, called the "Income Achievement Holdback" which entitled Debtor to receive up to an additional $1,000,000.00 (included in the $16,500,000.00 loan amount) once "Annualized Adjusted Gross Receipts," as defined in the Agreement, generated by the Property exceeded the sum of $1,435,000.00

per year. They alleged that this figure was to be based upon projection of actual rents being received from rent paying tenants in occupancy.

13. On or about June 30, 1989, Alfred Cole, Jr., an employee of Corum, acting on behalf of Debtor, its general partner, Cole, Sr., and Treadwell, requested that Boston advance the entire $1,000,000.00 from the Income Achievement Holdback. In support of this request he submitted a calculation which he had prepared for the Income Achievement Holdback. He testified that this calculation was made according to his understanding of the agreement by using the Example Exhibit attached to the Loan Agreement. He also attached a copy of the June rent roll. This rent roll showed tenants by name and market and street rent. Cole, Jr. testified that he was acting in good faith based upon his understanding of the agreement.

14. In addition to the request for disbursement of the Income Achievement Holdback, Cole, Jr. included an operating statement which reflected receipts and disbursements for the Property through June 25, 1989, and requested disbursement of $248,305.22 from the Deficit Holdback to cover operating losses incurred through that date.

15. Boston representatives testified that they did not receive another operating statement from Debtor until on or about October 4, 1989, which reflected the receipts and disbursements for the Property through September 25, 1989.

16. On or about August 2, 1989, Cole, Sr. and Treadwell, who are conditional guarantors of a portion of the Loan, signed a certificate in which they stated that the terms and provisions of the Loan Agreement had been met; that no material adverse change had occurred in their financial condition since their financial statement had been submitted to Boston for the Loan; and that there were no judicial or other actions pending or threatened which, if adversely determined, would materially affect their financial condition. Mr. Cole, Sr. testified at trial that, while he was involved in some litigation, either he had

orally informed Boston about it or it was inconsequential.

17. Before the funding of the Holdback, representatives of Boston visited the Property and talked with Cole, Jr. During that visit, they questioned Cole, Jr. about deficiencies in his reporting procedures and about his calculation for the Holdback. After calling Cole's attention to the figure he had submitted, the representatives explained to him that $1,700.00 would have to be deducted from the June income, as this amount represented delinquent rent which she had discovered in the rent roll. Lisa Mitchelson, Boston's employee, subtracted this amount from Cole, Jr.'s figure and noted this new balance on the final page of that rent roll. On August 30, 1989, after receiving all of the above information and after having representatives visit the property, Boston advanced the entire Income Achievement Holdback to Debtor and, additionally, paid the amount requested from the Deficit Holdback.

18. On September 27, 1989, Debtor disbursed the entire $1,000,000.00 Income Achievement Holdback to or for the benefit of its partners as follows:

a. $593,661.00 to its general partner, Forest Ridge Company;

b. $165,400.00 to each of its limited partners, Benjamin Bollag and Sheldon Perl; and

c. The remainder to Corum.

19. Forest Ridge Company disbursed the $593,661.00 which it received as follows:

a. $165,400.00 to its limited partner, JMS Associates; and

b. Approximately $438,000.00, representing the remainder plus some earned interest, was disbursed as follows:

(i) $100,000.00 to James Treadwell;

(ii) $238,000.00 to Overlook, an entity unrelated to Debtor in which Cole, Sr. and Treadwell are principals;

(iii) $50,000.00 for homeowner association fees for Overlook, Dunwoody Ridge, and North Forest, entities unrelated to Debtor in which Cole, Sr. and Treadwell are principals; and

(iv) $50,000.00 to "Investors" in Florida.

20. At the time Debtor and its general partner, Forest Ridge Company, disbursed the $1,000,000.00, Debtor was experiencing financial difficulties.

21. As a result of disbursing the $1,000,000.00 Income Achievement Holdback, Debtor's obligation for interest on the Loan was increased by $90,000.00 per year or $7,500.00 per month from and after August 30, 1989, and the interest installment due on October 10, 1989, for interest accruing to the month of September was $126,035.60, the statement for which was mailed to Debtor on September 15, 1989.

22. Debtor initially failed to pay the October 10, 1989, interest installment on the Loan, but this debt was subsequently paid from cash generated from the Property and funds advanced by Boston from the Deficit Holdback.

23. Again Debtor failed to pay the November 10, 1989, interest installment on the Loan which was subsequently paid from cash generated from the Property and funds advanced by Boston from the Deficit Holdback.

24. Debtor failed to pay the December 10, 1989, interest installment on the Loan and it remains unpaid, and no payment has been received by Boston since November, 1989.

25. After September 27, 1989, Boston learned that, contrary to their understanding of the Income Achievement Holdback calculations and rent roll submitted by Alfred Cole, Jr. which were made in connection with the request for the $1,000,000.00 Income Achievement Holdback on June 30, 1989, the Debtor did not have leases with rent paying tenants in occupancy sufficient to generate Annualized Adjusted Gross Receipts in excess of $1,435,000.00 for the month of June. Due to this discovery, Debtor was not entitled to any portion of the Income Achievement Holdback in Boston's opinion. Further, it became obvious to Boston at that time that the Property was actually operating at a loss; that the monthly income from the Property was not even sufficient, after payment of normal operating expenses, to pay monthly interest payments on the Boston Company loan on the initial funding of $15,105,000.00.

26. In October, 1989, Boston demanded the return of the $1,000,000.00 Income Achievement Holdback. The Debtor did not comply with this request, as they took the position that Boston had no right to have this amount returned.

27. Debtor showed accounts payable at the end of November, 1989, of $2,856.00. Debtor had gross income of approximately $149,000.00 per month during December, 1989, and January, 1990. After Boston's demand, the Debtor did not pay its operating debts for November, 1989, through January 17, 1990, resulting in prepetition unsecured claims totalling $106,994.59. This amount is less than 1% of the indebtedness owed by Debtor to Boston. Approximately $47,000.00 of the $106,994.54 may be covered by insurance.

28. The Debtor hired attorneys during this period and paid those attorneys over $100,000.00 during November, 1989, through January, 1990, when Debtor's petition was filed.

29. The Debtor also failed to pay the 1989 ad valorem taxes on the Property during this period, which constitute a first lien on the property. The Debtor had a tax escrow account of $131,961.00 during this period.

30. On or about December 12, 1989, Boston notified Debtor that it had failed to pay the December 10, 1989, interest installment on the Loan in the amount of $123,302.78 and that it had three business days to cure this failure.

31. On or about December 19, 1989, Boston notified Debtor that its failure to pay the December 10, 1989, interest installment was an event of default under the Loan and that it was exercising its rights under the Assignment of Rentals to receive all rents not reasonably necessary to operate the Property.

32. On or about December 27, 1989, Boston notified Debtor that it had acceler-

ated the maturity date of the Loan, demanded repayment of the entire indebtedness, and stated that if payment was not made by January 4, 1990, it would exercise its remedies as allowed by the Loan documents and applicable law.

33. On January 17, 1990, the Debtor filed a petition for relief under Chapter 11 of the bankruptcy code. Also on January 17, 1990, subsequent to the bankruptcy filing, Boston caused foreclosure proceedings to be commenced against the Debtor's property.

34. During 1989, the Debtor expended lease up costs in the amount of $134,168.25 which came out of Debtor's operating funds. These lease up costs included advertising and bonuses paid to leasing agents. As a result of these zealous lease up efforts, and by the time of the request for the Income Achievement Holdback in June, the property was reportedly leased up at ninety-five (95%) percent. In July, however, this occupancy level began to drop while at the same time the occupancy levels of comparable properties remained steady in the mid 90% range. The Debtor then also experienced a high number of NSF checks, and a large number of tenants moving out as a result of skips, evictions, or inability to pay.

35. Corum has received construction fees from the Debtor in the amount of approximately $690,000.00, $269,092.16 of which was paid from approximately February, 1989, to November, 1989, for fees reported to have been due in January, 1989.

36. As of January 17, 1990, the Debtor owed Boston $16,793,954.17, consisting of unpaid principal of $16,478,808.95, interest of $310,213.10, and late charges of $4,932.11, but excluding Boston's costs, attorney's fees, and prepayment premium.

37. The value of the Property, not including Debtor's accounts, is between $16,175,000.00 and $16,600,000.00.

38. The value of the Property at this time is stable, neither appreciating or depreciating.

39. Debtor has no meaningful source of income other than the rents and other income from the operation of the Property.

40. Based upon Debtor's actual receipts and disbursements as shown in its 1989 and 1990 operating statements, during the period beginning the end of June, 1989, when the Property was reported to be leased up, and ending March, 1990, the average total monthly income was approximately $155,000.00. The average total operating expenses, including the tax escrow and replacement reserve was more than $82,000.00. The monthly debt service, which has a current interest rate of 9%, on the principal balance of the Loan of just under $16,500,000.00 is over $123,000.00.

41. Boston's witnesses testified that, given a 100% occupancy of the Property at its current market rates, less 5% for vacancy and non-revenue units, monthly operating expenses of $73,000.00—including tax escrow of $14,300.00 and replacement reserve of $5,500.00 per month, which is $9,000.00 less than Debtor's actual average operating expenses from June, 1989, to March, 1990 and all other terms and provisions being the same as the Boston Loan, including a 9% interest rate—the Debtor could carry a loan of only $14,100,000.00.

42. Debtor is now 92% leased after dropping the rate for each unit by $50.00 per month and offering other concessions. Debtor has made projections which are based upon Debtor achieving 95% leased by August, 1990, and maintaining that level thereafter. The Debtor's projections are based upon Debtor achieving gross monthly income of $165,000.00 by September, 1990, with that number increasing by a total of $19,500.00 over the following 16 months. The highest gross monthly income achieved by Debtor thus far was $164,826.91 in August, 1989. This successful period resulted from the Debtor's attempts to lease up the Property with the aid of the Debtor's leasing bonuses and advertising. This income resulted from the old rental rates. Operating expenses for that month were $78,856.75 including tax escrow and replacement reserve.

43. The Debtor's projections are based upon Debtor achieving operating expenses of $62,000.00 by September, 1990, and maintaining that level thereafter.

44. To effectuate a plan, a $160,000.00 letter of credit has been proposed by the Debtor to secure payment of the short term deficits, the remainder of the plan as proposed is to be entirely funded from the cash flow of the Property.

## CONCLUSIONS OF LAW

### I. MOTION TO DISMISS

■ Due to the nature of bankruptcy as an equitable remedy, both bankruptcy and appellate courts have required a debtor filing Chapter 11 to do so in "good faith." *In Re Carolin Corp.*, 886 F.2d 693 (4th Cir. 1989); *In re Little Creek*, 779 F.2d 1068, 13 CBC 2d 1231 (5th Cir.1986). The purpose of the good faith requirement is to prevent abuse of the bankruptcy process by Debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes. The Fourth Circuit in *Carolin* recently adopted the *Little Creek* test of bad faith filings wherein the Bankruptcy Court is to conduct an "on the spot" evaluation of debtor's financial condition, motive and local financial realities, and has required that before a case is dismissed, there be demonstrated objective futility and subjective bad faith. *Carolin*, citing *Little Creek*.

■ The criteria set out in *Little Creek* which evidence these bad faith elements include the following:

1. One asset debtor.

2. Totally encumbered assets.

3. No employees.

4. Inadequate cash flow.

5. Few unsecured claims of relative small amounts.

6. Property in foreclosure.

7. Bankruptcy is the only way of forestalling loss of the property.

8. Wrongdoing by Debtor's principals.

*Little Creek* justifies dismissal for bad faith by explaining that:

Resort to the protection of the Bankruptcy Laws is not proper under those circumstances because there is no going concern to preserve, there are no employees to protect and there is no hope of rehabilitation, except according to the Debtor's 'terminal euphoria'. *Little Creek*.

On the hearing date, Boston Company devoted considerable time and effort to its attempt to demonstrate that certain prefiling conduct alleged to have occurred is sufficient to support a finding that this case was filed in subjective bad faith.

■ In *Carolin*, the Fourth Circuit stated the subjective bad faith inquiry is designed "to insure that the petitioner actually intends 'to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business'". 886 F.2d at 702 (citations omitted). The Fourth Circuit said that stating the question another way, the inquiry was to determine whether the Chapter 11 debtor's real motivation in filing was to abuse the reorganization process and cause hardship or delay to creditors by invoking the automatic stay with no intent or ability to reorganize, 886 F.2d at 702. In *Carolin*, the Fourth Circuit warned that bad faith filing should not be decided on the basis of mere indicia counting, i.e., forcing particular facts into previously identified patterns. Regarding indicia, the Fourth Circuit specifically stated that one asset debtors are proper subjects of Chapter 11 relief. 886 F.2d at 704. Under *Carolin*, the focus of the inquiry thus become whether Debtor Forest Ridge has an honest intent to reorganize, or whether this proceeding was filed for some improper purpose without any intent or ability to reorganize. After reviewing the evidence, the court finds that Boston Company has not demonstrated this case was filed without honest intent to reorganize, or that this case is an abuse of the reorganization process.

First, compared to the debtor in *Carolin*, Debtor Forest Ridge has a reasonable prospect of reorganizing, and evidences an intent to do so. The Plan outlined in Mr.

Cole, Sr.'s testimony proposes payment of administrative claims, tax claims, the Boston Company unsecured claim, and the Boston Company secured claim in full. According to that Plan as outlined, trade creditors are to be paid a substantial dividend in cash. If that proposed Plan is followed, they will receive an evidence of indebtedness such that any remaining amount due trade creditors will be paid before equity holders receive any distribution. Equity holders would not receive any benefit resulting from the operation of Debtor Forest Ridge's property until all creditors are paid. New equity capital will be infused. There is a reasonable prospect of the Plan being implemented. The Plan clearly indicates an intent to repay debt; the Plan indicates to the court that the debtor does not intend to abuse the bankruptcy process. That plan as outlined is offered as evidence of intent, and need not be complete to the extent that it is confirmable as of the date of the dismissal hearing.

Second, the conduct of this Chapter 11 case to date belies any intent to abuse the bankruptcy process. The case could arguably have been filed in Georgia where Debtor Forest Ridge's mailing address is located and where its business and financial records are maintained, and its operating partners are located. Instead, Debtor Forest Ridge filed this case where the property is located, and where creditors are concentrated. There is no claim the case was filed irresponsibly or has been conducted irresponsibly. There is also no claim that the case has been conducted in a dilatory manner. Since the filing, the evidence is uncontested that Debtor Forest Ridge has complied with the time requirements of all court orders and the Bankruptcy Code, as well as all other Orders issued in this case. Schedules, Statements of Affairs, and other reports have been filed timely, and without request for extension. Mr. Cole, Sr. has testified Debtor Forest Ridge will file its proposed Plan within the exclusive period, without request for extension. The only requests for continuance of this hearing on Boston Company's Motion to dismiss were made by Boston Company,

and the last continuance was granted over Debtor Forest Ridge's objection.

Third, contrary to *Carolin*, there is here no evidence of new debtor syndrome, and there is no evidence that this case is being used to shield persons from claims, or to shelter assets. Debtor Forest Ridge is the limited partnership which has owned this property since development was undertaken. Its general partner, Forest Ridge Company, is a limited partnership which has always been the general partner. It has not been proven that the general partners of Forest Ridge Company are shell corporations.

Fourth, contrary to the facts of *Carolin*, the business conducted by Debtor Forest Ridge, i.e., the operation of 330-units, is not a fire-damaged, shut down shell. The property is well maintained, ninety-two (92%) percent leased, and operating with a staff of three (3) full time on-site leasing employees, and three (3) full time on-site maintenance employees, all of whom are directed by a management company owned by the two (2) general partners of Forest Ridge Company, the general partner of Debtor Forest Ridge.

Fifth, contrary to *Carolin*, Debtor Forest Ridge has indicated an intent to infuse new equity capital in order to fund the Chapter 11 Plan. Boston Company has not attempted to show Debtor Forest Ridge will be unable to obtain the infusion of equity capital Mr. Cole, Sr. testified would be made available.

As additional grounds for a "bad faith" dismissal, Boston Company has devoted considerable time to certain pre-filing conduct or circumstances which it contends constitute this subjective "bad faith" or an element thereof, which requires dismissal of this Chapter 11 case. These points are discussed briefly below.

Boston Company contends Debtor Forest Ridge does not presently have any money invested in the property. On this basis, Boston Company contends Debtor Forest Ridge has nothing at risk. The evidence is clear that from the outset Boston Company understood that once it funded $15,100,-000.00 of its $16,500,000.00 loan, it was

funding one hundred (100%) percent of the cost of this project, excluding a builder's and developer's profit. The evidence is likewise clear that at the outset of the transaction Boston Company understood that once the $1,000,000.00 Income Achievement Holdback was funded, Boston Company would be funding amounts constituting builder's and developer's profits, such that Debtor Forest Ridge would have money to distribute to partners. For this $16,500,000.00 loan with the above-described economic results, Debtor Forest Ridge gave up fifty-five (55%) percent of its equity and fifty-five (55%) percent of the cash flow of the project. This was an arms length deal when consummated. The fact that by the time of the Chapter 11 filing the $16,500,000.00 had been funded with the foreseeable result that Debtor Forest Ridge had been reimbursed all of its costs plus the anticipated profit, does not mean a subsequent Chapter 11 is filed in bad faith. Further, under Debtor Forest Ridge's Plan outlined at the hearing, Debtor Forest Ridge will remain at risk regarding deficit operations, and Debtor Forest Ridge will remain at risk regarding the loss of its forty-five (45%) percent interest in any residual cash flow and equity, in the event the payments under the Plan are not made.

Boston Company has contended that Boston Company funded $1,000,000.00 of its loan in reliance on misleading information furnished by Debtor Forest Ridge. Boston Company apparently contended that this case should be dismissed for bad faith filing on the basis of this alleged misleading information.

The evidence is clear that the parties are currently in disagreement about the meaning of the documents relating to the funding of the $1,000,000.00 Income Achievement Holdback. Boston Company contends the $1,000,000.00 Income Achievement Holdback was required to be based on actual monthly income received, multiplied by twelve (12). Mr. Cole, Jr. testified the income achievement holdback calculation was supposed to be based on valuations of leases, and he testified as to four (4) specific exceptions from the requirement that the income projection be based

on actual rents. Mr. Cole, Jr. testified he, as Debtor Forest Ridge's representative, was responsible for negotiating the loan commitment. Mr. Cole, Jr. testified that in negotiating the loan commitment, he requested that Boston Company employee Jill Hatton furnish a specific example, using numbers, to demonstrate the manner in which the $1,000,000.00 Income Achievement Holdback calculation would be made. Mr. Cole, Jr. testified that an Exhibit attached to the Loan Commitment was furnished as that example by Jill Hatton. Cole, Jr. testified that he calculated his figures for the Holdback as he understood from the example that they were to be calculated. Additionally, Boston has asserted that the principals of the Debtor misled it regarding the Holdback funding by signing statements that no litigation was pending against them. That litigation, however, was either inconsequential or was revealed to Boston in a manner in which the Debtor's principals thought sufficient. These representations are insufficient to show bad faith on the part of the Debtor warranting dismissal of the bankruptcy case. Boston has, in the court's opinion, failed to prove that this testimony was false or that his calculations were made in bad faith or constituted wrong doing on the part of the Debtor's principals.

It appears to the court that this "misleading" information was the result of a misunderstanding. At the very best, the court is balanced on the issue of misrepresentation through "misleading information," and therefore, Boston has failed on its burden of proving misrepresentation on the part of the Debtor or its representatives.

## II. BOSTON COMPANY'S MOTION TO LIFT STAY

Boston Company has moved to lift the automatic stay applicable to this property. In its pretrial brief, Boston Company focused primarily on § 362(d)(2) of the Code. Under § 362(d)(2) of the Code, two (2) findings of fact are required in order to lift stay: (i) that Debtor Forest Ridge does not have an equity in the property; (ii) that

the property held by Debtor Forest Ridge is not necessary to an effective reorganization.

At the hearing, Boston Company submitted evidence that its pre-petition claim was $16,478,808.95 principal, plus $246,893.85 accrued interest through January 10, 1990, for a total pre-petition indebtedness of $16,725,702.80. Boston Company's appraiser, Paul Harrison, testified that Debtor Forest Ridge's property had a value of $16,175,000.00 as of the date of hearing. Debtor Forest Ridge presented no evidence of value. Thus, for the purpose of this hearing, the court finds there is no equity in Debtor Forest Ridge's property, and Boston Company is an undersecured creditor.

Regarding the second finding of fact which must be made in order to warrant lifting of the stay under § 362(d)(2), Debtor Forest Ridge's witness, Mr. Cole, Sr., testified this property was necessary for an effective reorganization. Of course, this is the case if there is to be a reorganization, since this property is Debtor Forest Ridge's principal asset. However, "necessary to an effective reorganization" in this context means that the property will be necessary in order to pursue a reorganization which has a reasonable possibility of success within a reasonable time period. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). This court has discussed pursuant to the Motion to Dismiss the basis for its findings that Debtor Forest Ridge has a reasonable prospect for pursuing an effective reorganization. Because the court finds as fact that Debtor Forest Ridge has met its burden of demonstrating a reasonable prospect of pursuing a successful reorganization, and because Debtor Forest Ridge's 330–unit multi-family project is obviously necessary to pursue such a reorganization, Boston Company's Motion to lift stay under § 362(d)(2) must be denied.

▪ In closing argument, Boston Company's counsel argued that the evidence demonstrated mismanagement sufficient to constitute "cause" so as to warrant a lifting of the stay under § 362(d)(1). The court finds the property is not being presently mismanaged so as to constitute cause for lifting stay under § 362(d)(1). The property is properly staffed with three (3) maintenance men and three (3) leasing agents. As set forth above, it is undisputed that the property is in excellent physical condition, and is not deteriorating in any way physically. The percentage of apartments leased has increased by ten (10) percentage points during the short pendency of this case and is presently at ninety-two (92%) percent. The rent rate structure is within the market. The persons ultimately responsible for the management of this property, Alfred J. Cole, Sr. and James R. Treadwell, have extensive experience in day to day management of multi-family units. Boston Company has not carried its burden on its allegation of mismanagement sufficient to constitute cause under § 362(d)(1).

## III. MOTION TO SEQUESTER RENTS

Boston Company has moved for an order sequestering rents, contending it holds a rent assignment which gives Boston Company a perfected security interest in post-petition rents. At closing argument, Boston Company's counsel modified its position, stating that Boston Company did not object to Debtor Forest Ridge paying from rent collections the reasonable and necessary operating expenses of the property. This nevertheless leaves for decision whether Boston Company has any interest in the post-petition or pre-petition rents, which would be subject to Boston Company's claim of sequestration, or in the terms of the Bankruptcy Code, may constitute cash collateral under § 363 of the Code.

In *Westchase I Associates L.P.,* Case No. C–B–89–31225, decided February 21, 1990, this court considered and decided the question raised by Boston Company in its claim for sequestration of rents. In *Westchase I,* the secured creditor held an assignment of rent. The secured creditor had declared a default, filed a notice of hearing on foreclosure under its Deed of Trust, and filed a

petition for appointment of receiver. Approximately fifteen (15) days after these actions, the Debtor commenced a Chapter 11 case in this court. The secured creditor moved for an order directing sequestration of rents. *Westchase I* is a lengthy decision in which this court attempted to analyze all appropriate authorities under Federal and North Carolina law, and all available arguments regarding whether a secured creditor holding a rent assignment, but not in possession of the real estate, can have a perfected security interest in post-petition rents under North Caroline law. After analysis, this court concluded that even though a secured creditor may hold a recorded rent assignment which appears to be absolute on its face, the rent assignment is not sufficient to provide that creditor with a perfected security interest in post-petition rents, if the secured creditor was not in actual or constructive possession of the real estate from which the rents arise, at the time of commencement of the Chapter 11 case. Without rewriting *Westchase I*, a short summary of the rationale is as follows:

First, § 362 of the Code stays any creditor from taking any action to create, perfect, or enforce a lien. Section 546(b) of the Code provides a limited exception to the automatic stay and allows post-petition perfection in certain limited circumstances in which state law allows retroactive perfection of security interests. After analyzing North Carolina law, this court concluded there are no provisions in North Carolina law which provide for relation back of the perfection of a security interest in rents and profits resulting from the operation of real estate; consequently, this court held that § 546(b) of the Code does not provide an exception to the automatic stay set forth in § 362 respecting rents. Thus, this court held the secured creditor could not perfect an otherwise unperfected claim in post-petition rents and profits.

Second, this court held that the effectiveness of a rent assignment is to be determined by applicable state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Saline State Bank v. Mahloch,* 834 F.2d 690, 692 (8th Cir.1987);

*In re Camelot Associates Ltd. Partnership,* 102 B.R. 161, 164 (Bkrtcy.D.Minn. 1989); *In re Prichard Plaza Associates Ltd. Partnership,* 84 B.R. 289, 293 (Bkrty. D.Mass 1988). In *Westchase I,* a North Carolina law controlled.

Third, this court held that under North Carolina law, a creditor holding an assignment of rents has no interest in rents and profits of the real estate so long as the mortgagor remains in possession and no receiver has been appointed. The court further held that the creditors' commencement of foreclosure proceedings alone, without obtaining possession of the property or appointment of receiver, was not sufficient to perfect the security interest in rents.

Fourth, this Court held that because the creditor in *Westchase I* which held the rent assignment was not in possession of the real estate at the time the Chapter 11 case was filed, and because no receiver had been appointed at the time the Chapter 11 case was filed, the creditor held no interest in rents and profits, and such rents and profits arising from the real estate did not constitute cash collateral as defined in § 363 of the Bankruptcy Code.

■ Boston Company argues that *Westchase I* is wrongly decided. This court is not prepared to reverse its *Westchase I* decision. In this case, it is undisputed that Debtor Forest Ridge was in possession of its real estate and was in possession of its rents, at the time this Chapter 11 case was filed. Boston Company had not obtained the appointment of a receiver, and had not even commenced an action seeking appointment of a receiver. No notice to tenants had been sent directing tenants to pay rent directly to Boston Company. At the time the case was filed, Boston Company had not commenced any foreclosure action. North Carolina law controls because the property is located in North Carolina and the documents specifically elect application of North Carolina law. For the reasons set forth above and in *Westchase I,* Boston Company has no perfected security interest in Debtor Forest Ridge's rents. These

rents do not constitute cash collateral within the meaning of § 363. Therefore, Boston Company's motion for an order prohibiting use of cash collateral and directing sequestration of rents and other payments must be denied.

### IV. MOTION FOR ADEQUATE PROTECTION REGARDING DEBTOR FOREST RIDGE'S USE OF ALLEGED CASH COLLATERAL, AND DEBTOR FOREST RIDGE'S MOTION FOR PERMISSION TO USE ALLEGED CASH COLLATERAL

At the outset of this case, Debtor Forest Ridge moved for an order authorizing use of cash collateral under § 363 of the Code. The court entered a preliminary order authorizing use of cash collateral. Boston Company has moved for an order requiring adequate protection regarding the use of any cash collateral. In division III. above, this court has ruled that Boston Company does not have a perfected security interest in Debtor Forest Ridge's post-petition or pre-petition rents; thus, these rents are not cash collateral. Even if Boston Company does have an interest in this alleged cash collateral, the court concludes that the Debtor's Motion to use cash collateral should be granted and that Boston Company's Motion for adequate protection of this cash collateral should be denied.

The facts relevant to these conclusions may be summarized as follows. As set forth above, the court finds Debtor Forest Ridge's real estate is not deteriorating. Nor is the real estate decreasing in value at this time. The property generates approximately $80,000.00 of net income per month, after payment of operating expenses, and escrowing prorated amounts for real estate taxes, but before debt service. The court has found reasonable Debtor Forest Ridges's projections that monthly net income is likely to increase.

Additionally, on the basis of the evidence, the court finds that the expenses set forth on Debtor Forest Ridge's cash collateral budget, D–54, are necessary and reasonable expenses related to the operation of Debtor Forest Ridge's 330–unit multi-family.

During closing argument, Boston Company's counsel stated that Boston Company did not object to the payment of reasonable and necessary operating expenses pertaining to the operation of Debtor Forest Ridge's 330–multi–family units. This statement left unclear whether Boston Company contends that it is entitled to any specific adequate protection as a result of use of alleged cash collateral, other than the application of the rents to the payment of necessary and reasonable operating expenses. This question is decided below.

Under 11 U.S.C. § 361(1) and § 363, a secured creditor is entitled to adequate protection in the event a debtor uses the secured creditor's cash collateral. The adequate protection to which the secured creditor is entitled is adequate protection of the value of the secured creditor's interest in the cash collateral sought to be used. In determining the extent to which the secured creditor is entitled to such adequate protection, the focus is on the value of the secured creditor's interest in the cash collateral. 11 U.S.C. § 361(1); *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *In re Prichard Plaza Associates Ltd. Partnership*, 84 B.R. 289, 301–302 (Bkrtcy.D.Mass.1988).

Under the facts of this case, the value of Boston Company's interest in any cash collateral generated by the operation of debtor Forest Ridge's property does not exceed the amount of net income resulting from the operation of Debtor Forest Ridge's property, after the payment of actual, reasonable, and necessary expenses required to operate the property. *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bkrtcy. D.Colo.1986); *In re Marion Street Partnership, supra.* This is so because if Boston Company were to obtain appointment of a receiver and operate Debtor Forest Ridge's property for Boston Company's benefit, Boston Company would nevertheless be required to pay the monthly operating expenses, such that Boston Company

could only receive the net income after payment of these operating expenses. *In re Morning Star Ranch Resorts, supra*, at 822. Indeed, if Boston Company were given a deed to Debtor Forest Ridge's property, Boston Company would not receive from the operation of the property more than the net operating income.

To the extent any cash collateral of Debtor Forest Ridge is used to pay actual, reasonable, and necessary operating expenses related to the operation of Debtor Forest Ridge's property, Boston Company is adequately protected by an order which restricts Debtor Forest Ridge's use of cash collateral to the payment of actual, reasonable, and necessary operating expenses, and requires Debtor Forest Ridge to escrow net operating income for further disposition pursuant to an order confirming its Plan, or other order of Court. *In re Pine Lake Village Apartments Co.*, 16 B.R. 750 (Bkrtcy.S.D.N.Y.1982); *In re Morning Star Ranch Resorts, supra; In re Marion Street Partnership, supra.*

For the foregoing reasons, Boston Company's Motion for Adequate Protection respecting use of cash collateral should be denied and Debtor Forest Ridge's motion for permission to use alleged cash collateral should be granted. Debtor Forest Ridge is specifically authorized to pay the operating expenses set forth on its cash collateral budget, including post-petition management fees computed at four (4%) percent of gross rents, which fees have been accrued, but not paid, pending this hearing. The ruling set out in this division is not a limitation of this court's ruling in division III. above, in which this court held rents were not cash collateral but is an additional ground for allowing the Debtor's full use of the rents and profits of the property.

## V. BOSTON COMPANY'S MOTION FOR ADEQUATE PROTECTION AS TO REAL ESTATE

In its moving papers, Boston Company included a Motion for Adequate Protection respecting the stay of its ability to exercise any rights to proceed against Debtor Forest Ridge's 330–unit multi-family project. Based on the evidence submitted by Boston Company, Boston Company is an undersecured creditor. It claims a pre-petition indebtedness totalling $16,725,-702.80. Its appraiser testified Debtor Forest Ridge's property has a value of $16,-175,000.00. Thus, by its own evidence, Boston Company has placed itself in a situation where its right to adequate protection payments are directly controlled by *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In *Timbers*, the Supreme Court specifically held that a finding that a secured creditor is undersecured, absolutely precludes the secured creditor from recovering interest on its claimed indebtedness. 484 U.S. at 372, 373, 108 S.Ct. at 630, 631. The Supreme Court also specifically held that an undersecured creditor was not entitled to receive interest payments on the value of its real estate collateral, which was found to be less than the amount of its total claim. 484 U.S. at 373, 108 S.Ct. at 631. Finally, the Supreme Court specifically held that an undersecured creditor may not receive any "lost opportunity" payments resulting from any delay in exercising its rights to its alleged real estate collateral. 484 U.S. at 371, 108 S.Ct. at 630. Under *Timbers*, the only adequate protection to which an undersecured creditor of real estate would be entitled is the diminution in value of its real estate collateral. 484 U.S. at 370, 108 S.Ct. at 629, 11 U.S.C. § 361(1).

Bankruptcy courts have consistently applied *Timbers*, to preclude payment of any interest or lost opportunity damages in cases similar to the instant case. For example, in *In re Marion Street Partnership*, 108 B.R. 218 (Bkrtcy.D.Minn.1989), the debtor's sole asset was an apartment complex. The bankruptcy court specifically found that the indebtedness exceeded the value of the apartment property. 108 B.R. at 224. The bankruptcy court found that the two general partners of the limited partnership were not willing to infuse additional personal funds into the partnership property. The court found the gross oper-

ating income was sufficient to pay operating expenses, but insufficient to pay debt service. The bankruptcy court denied the secured creditor's motion to require adequate protection payments, specifically holding that *Timbers* prevented payment of interest and prevented payment of damages resulting from any delay occasioned by the filing of the bankruptcy case. 108 B.R. at 224. The bankruptcy court held any inquiry regarding adequate protection for the undersecured creditor should be focused on whether the real estate collateral was actually decreasing in value. *Id.* On this issue, the court held the property was not declining in value; thus, it specifically held *no* adequate protection payments were required. 108 B.R. at 224, 225. Other courts have specifically applied *Timbers* in a like manner. See, e.g., *In re Triton/Richmond Associates Limited Associates Limited Partnership*, 103 B.R. 764, 767 (Bkrtcy.E.D.Va.1989).

Boston Company has not offered any authority by which it is entitled to adequate protection payments respecting real estate collateral, contrary to that set forth above. Boston Company's trial brief does not discuss any basis on which Boston Company would be entitled to any adequate protection payments respecting its real estate; Boston Company's attorneys made no argument in closing regarding any entitlement to adequate protection payments respecting the real estate collateral.

The only basis on which Boston Company could be entitled to adequate protection payments under the facts of this case would be if Boston Company were able to show the real estate collateral was decreasing in value, as required by *Timbers*. As *Timbers* made clear, the decrease in value which can be the subject of adequate protection payments is a depreciation "during the term of the stay," or in other words, after commencement of the Chapter 11 filing. See also *In re Marion Street Partnership*, 108 B.R. at 224. The evidence is clear that the real estate claimed as collateral by Boston Company has not declined in value since the date Debtor Forest Ridge filed its Chapter 11 Petition. All of the witnesses have testified the property is in excellent condition. Photographs submitted by the Debtor at hearing support this testimony. There is no claim of any substantial deferred maintenance. As discussed above, the percentage of apartment leased has increased from eighty-two (82%) percent to ninety-two (92%) percent since the filing of the Chapter 11 case, and both gross and net income are increasing. The court finds the real estate collateral is not decreasing in value. Therefore, no adequate protection payments are authorized under *Timbers*.

Based on the findings of fact and conclusions of law set forth above, it is hereby ORDERED:

1. Boston Company's Motion to Dismiss this Chapter 11 case is DENIED.

2. Boston Company's Motion for Relief from Stay is DENIED.

3. Boston Company's Motion for an order prohibiting use of cash collateral, or for sequestration of rents is DENIED. In the alternative, Boston Company's Motion for Adequate Protection respecting alleged cash collateral is DENIED, and Debtor Forest Ridge's Motion for permission to use alleged cash collateral is GRANTED. Specifically, Debtor Forest Ridge is authorized to use receipts generated by the operation of its property for the purpose of paying actual, reasonable, and necessary operating expenses as shown on Debtor Forest Ridge's cash collateral budget as submitted at the hearing. Debtor Forest Ridge is specifically authorized to pay management fees at four (4%) percent of gross rents, which have accrued, but have not been paid, since the filing date of this Chapter 11 case, January 17, 1990.

4. Boston Company's Motion for adequate protection respecting real estate is DENIED.

IT IS SO ORDERED.