**In re CAMPUS HOUSING DEVELOP-
ERS, INC., d/b/a The
Gatherings, Debtor.**

**Bankruptcy No. 90–07448.**

United States Bankruptcy Court,
N.D. Florida,
Tallahassee Division.

March 6, 1991.

Sandra Stockwell and Stephen Turner,
Tallahassee, Fla., for debtor.

Gregg McClosky, Boca Raton, Fla., for
RTC.

## ORDER ON CREDITOR'S MOTION TO DISMISS

LEWIS M. KILLIAN, Jr., Bankruptcy
Judge.

This matter is before the Court on Reso-
lution Trust Corporation's ("RTC") motion
to dismiss and motion for relief from the
automatic stay. RTC, the successor in in-
terest to First Atlantic Federal Savings &
Loan, alleges the petition for relief under
Chapter 11 of the Bankruptcy Code was
filed in bad faith with the intent to hinder
or delay the legitimate recovery efforts of
RTC. The debtor ("CHD") asserts that it
did not file the petition in bankruptcy to
delay the efforts of RTC, but filed with the
real intent to reorganize. Having con-
sidered the lengthy argument of counsel,
along with the filed memorandum of law
and for the reasons set forth below, we
find that the debtor's petition was filed in
bad faith and should be dismissed.

### FACTS

CHD's sole asset is approximately 45
acres of land which is partially developed
with 189 apartment units. RTC holds the
first mortgage encumbering this property
and is the only secured creditor in this
proceeding. Twenty-four of the 45 acres
are undeveloped. The complex containing
the 189 rental units is collectively known as
the Gatherings. The Gatherings rents ex-
clusively to college students and boasts a
100% occupancy rate.

In June, 1987, CHD and Inland Servicing
Corporation ("ISC") joined together as
partners to form North Florida Develop-
ment Associates ("NFDA"). This partner-
ship arranged to purchase the Gatherings
from a Texas corporation. The previous
owner had built 21 units on the 45 acres
and was selling the units as condominiums.
NFDA obtained the financing for the pur-

chase from First Atlantic Savings and Loan Association. NFDA and First Atlantic entered into a mortgage agreement on November 13, 1987, whereby, First Atlantic agreed to loan NFDA $8,600,000. The loan was a construction loan which allowed the builder to pay only the interest on the loan until November 1, 1989, the loan's maturity date. Upon completion and sale of each unit, a certain sum would be paid to the bank, the bank would release the unit from the mortgage, and the balance of the mortgage would be reduced. The original mortgage was modified on June 16, 1989 to increase the amount of the mortgage to $9,350,000.

On August 11, 1989, CHD entered into a Modification and Assumption Agreement with First Atlantic in which CHD solely assumed the loan and mortgage obligations of NFDA. Additionally, the mortgage was increased from $9,350,000 to $10,750,000 and CHD and First Atlantic agreed that the loan would be a revolving loan. This allowed CHD to use all funds up to $10,-750,000 to continue the development of the project.

Prior to CHD taking sole possession of the project, NFDA had decided that the units would be more profitable as apartments. However, the mortgage was not amended to reflect the change in the development of the project and did not contain provisions which would permit permanent financing. CHD claims that First Atlantic agreed to provide permanent financing while the project was being developed. However, First Atlantic had its own financial problems, eventually coming under the supervision of RTC, and was not able to provide the permanent financing.

Because the project had been converted into an apartment complex, the units were not being sold and the loan was not being reduced through sales of units. At maturity, the balance on the note was $10,749,-517.96. CHD did not have the ability to pay the amount due and also had trouble meeting the $101,000 to $109,000 per month interest payments. To avoid default and foreclosure on the project, CHD proposed to pay $95,000 a month until it could obtain refinancing. While CHD attempted to obtain refinancing it continued to negotiate with RTC regarding the position RTC would take upon refinancing. CHD apparently had a few interested lenders and proposed to RTC that CHD would obtain $7,500,000 financing for the developed portion, which would be given to RTC, and RTC would release that portion from the mortgage. RTC would then retain a lien on the undeveloped portion for the remaining balance on the mortgage.

In January, 1990, RTC agreed to not take any legal collection action against CHD for three months as long as certain conditions were all met: (a) CHD would make the $95,000 payments for those months; (b) CHD would obtain a permanent mortgage and reduce RTC's mortgage to an amount not greater than $3,788,900; (c) RTC would retain a second mortgage in the amount of $2,000,000 on the developed property; (d) a 12 month interest reserve at 12% would be established on the amount of RTC's mortgage balance; and, (e) CHD must obtain a new construction mortgage for 200 units at a release price of $7,500 per unit payable to RTC at closing. Apparently, RTC thought that these conditions were necessary to remain secure.

CHD was not able to find financing to meet RTC's terms and also did not keep current on the monthly payments. RTC made a payment in January, and a payment in March, but the March payment was returned for insufficient funds. Except for the money paid from the court registry to RTC after foreclosure, CHD has made no other payments to RTC. Consequently, RTC filed suit, on March 30, 1990, in state court to foreclose on the property. In response, CHD asserted affirmative defenses and counter-claims. The issues raised in CHD's counter-claims were hotly contested, leading to an abundance of discovery. After considering those issues, the state court determined that the issues were without merit and granted summary judgment in favor of RTC. Throughout the foreclosure, CHD continued to look for additional financing and to attempt to negotiate with RTC.

In August, 1990, RTC agreed that it would release the two parcels of land for $9,000,000. As an alternative to receiving the whole sum, RTC agreed to release the developed parcel for $7,500,000, but required assurance on the remaining $1,500,-000. For that assurance, it requested that it be given a second mortgage on the developed portion. CHD still was not able to obtain enough financing to satisfy RTC's request.

On November 8, 1990, the state court pronounced its judgment and entered its final judgment of foreclosure on November 20, 1990. Knowing it had lost in state court, and not being able to obtain the necessary financing to receive a release from RTC, CHD filed bankruptcy on November 19, 1990. This prevented RTC from selling the property. RTC asserts that the filing of the bankruptcy was done in bad faith, merely to prevent the sale and frustrate RTC's legitimate collection efforts, and asks that the bankruptcy be dismissed.

## CONCLUSIONS OF LAW

■ Bankruptcy Code § 1112(b) authorizes the court to dismiss a Chapter 11 case for cause. While the determination of cause is subject to judicial discretion under the circumstances of each case, the Eleventh Circuit has stated that the debtor's lack of good faith in filing a petition in bankruptcy may constitute cause for dismissal of the petition. *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984).

Cases involving a single asset and a single secured creditor almost always lead to the question of whether the petition was filed in bad faith. When deciding whether a petition was filed in bad faith the central issue is whether the filing of the petition was for "reasons consistent with the congressional intent of rehabilitating and reorganizing businesses or whether it filed for the purpose of delaying or frustrating [the creditor] from proceeding with foreclosure sale and realizing on [its] collateral." *In re Sar–Manco, Inc.*, 70 B.R. 132, 139 (Bkrtcy. M.D.Fla.1986). The Eleventh Circuit has adopted the decisions of other courts and

considers numerous factors when determining whether a debtor has filed a petition in bad faith. These factors include:

(1) The debtor has only one asset in which it does not hold legal title;

(2) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(3) The debtor has few employees;

(4) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending state court action; and

(5) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*In re Phoenix Picadilly*, 849 F.2d 1393 (11th Cir.1988).

Some courts have found that in a case where the debtor meets each of these factors automatic dismissal for filing a petition in bad faith may not be warranted. *In re One Fourth Street North, Ltd.*, 105 B.R. 106 (Bkrtcy.M.D.Fla.1989); *In re Marion Street Partnership*, 108 B.R. 218 (Bkrtcy.Minn.1989); *In re Forest Ridge II, Ltd. Partnership*, 116 B.R. 937 (Bkrtcy.W.D.N.C.1990). However, in each of those cases, the courts determined that the debtor had a reasonable possibility of successful reorganization.

## ANALYSIS

■ There is no question that this dispute involves a single asset. CHD attempts to separate the land into the developed and the undeveloped parcels and claim these are two separate assets. However, RTC's lien extends to all 45 acres regardless of the state of improvement. The debtor's schedules lists its unsecured debt to be $99,660, compared to $11,575,000 in secured debt. Most of the unsecured debt represents professional services with only $30,000 representing trade debt. At the date of petition, virtually all its trade debts were current and, but for the bankruptcy, would have remained current. The debtor employs only three full-time employees. The debtor would not have filed bankrupt-

cy but for the foreclosure resulting from the dispute with RTC. There also is no dispute that the debtors did not file the petition in bankruptcy until the state court had ruled against them and the property was going to be sold, thus the filing frustrated RTC's efforts to enforce its rights.

At hearing, CHD did not present sufficient evidence to establish that it has a reasonable likelihood of a successful reorganization in a reasonable period of time. Currently, the units are 100% occupied and CHD cannot meet its debt service. CHD's only possibility of reorganization involves selling the developed portion of the property and then obtaining additional financing to develop the remaining 24 acres. There was no evidence presented that indicated that CHD could sell the property within a reasonable amount of time or of any commitments to finance construction of the remaining units. Based upon the evidence, we believe that the possibility of a successful reorganization is, at best, speculative.

## CONCLUSION

■ Considering the facts presented, it is clear that this matter is nothing but a two party dispute that was already litigated in state court. CHD has fought with RTC over this property for well over a year. When it could not obtain any additional financing on terms which would have protected RTC's position, RTC foreclosed. CHD then continued to fight the foreclosure by filing affirmative defenses and counter-claims. When it lost in the state court, it filed for the protection of the Bankruptcy Code in an attempt to force RTC to refinance the loan on terms which it could not negotiate. During the pendency of this case the parties have pursued that same discovery they pursued in the state court proceeding to further delay the disposition of this matter. The bankruptcy court was not intended to provide debtors with an alternate forum for private disputes. *In re Panache Development Company, Inc.*, 123 B.R. 929 (Bkrtcy.S.D.Fla. 1991), *citing In re Harvey Probber, Inc.*, 44 B.R. 647, 650 (Bkrtcy.Mass.1984).

CHD meets all of the criteria listed in *Phoenix Picadilly* indicating that the petition was filed in bad faith. Additionally, it appears that CHD does not have a reasonable possibility of a successful reorganization and filed bankruptcy merely to delay RTC from proceeding with the foreclosure sale and realizing on its collateral. Accordingly, it is

ORDERED AND ADJUDGED that RTC's motion to dismiss be granted and the motion for relief from stay is granted.

DONE AND ORDERED.